Filed 4/21/15

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

|  |  |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E059714 |
| v. | (Super.Ct.No. SWF1101032) |
| SHELBY GLENN SHAMBLIN, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Patrick F. Magers, Judge. (Retired judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opinion is certified for partial publication, with the exception of part 3 of the Analysis entitled, "The trial court's response to the deliberating jury's question," located on pages 33-41.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Shelby Glenn Shamblin of first degree murder (Pen. Code,[1] § 187, subd. (a), count 1), and he was sentenced to 25 years to life in state prison.  On appeal, defendant argues that there was insufficient evidence to support the conviction under either of the prosecution's theories—premeditated and deliberate murder or felony murder.  He also argues that the trial court erred in admitting post-*Miranda*[2] statements he made during a police interview and during the booking process.  Finally, he contends that the trial court erred in responding to the deliberating jury's note seeking clarification on the difference between first and second degree murder.  For the reasons discussed *post*, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1. *The 1980 murder and investigation*

In January 1980, Elizabeth Crossman (the victim), a 67-year-old woman, lived with her husband, Frank Crossman, in a house on West Florida Avenue in Hemet.  The

---

[1]  Unless stated otherwise, all further statutory references are to the Penal Code.

[2]  *Miranda v. Arizona* (1966) 384 U.S. 436.

couple's business, an RV trailer sales company, was located about 200 yards down the street from their house.[3]

On January 17, 1980, Frank Crossman returned home from work around 5:30 p.m. and found his wife dead in their back bedroom. He called the police, who arrived at the house around 5:45 p.m. They found the victim lying on the floor in the bedroom under a blanket. She was lying on her back, completely nude, and her legs were spread wide open. She had bruises on her throat, both thighs, and on the backs of her hands. There was semen oozing from her vagina onto the floor beneath her. The police collected vaginal swabs and other potential evidence from the scene, but they were unable to solve the case and after some time it went "cold."

In July 2002, Hemet Police Detective Jeff Dill looked into the case and sent vaginal swabs from the evidence file to the Department of Justice (DOJ) Crime Lab for DNA analysis.[4] A DOJ criminalist was able to extract a single male DNA profile from one of the vaginal swabs. Frank Crossman, who had passed away several years before,[5] was excluded as the donor of the male DNA on the swab. The unknown male DNA

---

[3] The victim owned both the trailer company and the house on West Florida Avenue.

[4] In 1980, when the murder occurred, the DOJ did not have DNA testing capabilities. The vaginal swabs taken at the scene were frozen and kept in evidence.

[5] He died in approximately 1995.

profile obtained from the swab was uploaded to DOJ's Combined DNA Index System (CODIS), a DNA profile database of arrestees and forensic unknowns.[6]

In October 2010, a DNA sample was taken from defendant during his arrest on a drug charge. This sample was sent to DOJ to be entered into CODIS. Two months later, a DOJ criminalist notified Detective Dill that defendant's DNA had produced a hit in CODIS. Detective Dill arrested defendant on February 2, 2011, and the police took another DNA sample from him. This second DNA sample matched defendant's 2010 DNA sample as well as the DNA recovered from the victim's vaginal swab.

2. *Defendant's statements to the police*

During his arrest on February 2, 2011, Detective Dill and another detective interviewed defendant at the Hemet police station. After this interview, defendant was taken to the Southwest Detention Center for booking. At trial, the prosecution played a portion of defendant's interview and called as a witness the booking deputy to testify as to statements defendant made to him during the fingerprinting process. The substance of defendant's interview and his conversation with the deputy is discussed in relevant detail in the section 2.a on the admissibility of his statements to the police, *post*.

---

[6] The DOJ administers California's CODIS and the FBI administers the federal CODIS.

3. *The evidence regarding first degree murder*

a. *The prosecution's case*

Elizabeth Crossman was 67 years old. On the day of the incident, January 17, 1980, Frank Crossman and his son-in-law had lunch with her at the couple's house on West Florida Avenue. Around 1:00 p.m., the men left the house and went back to work.

When the police arrived at the house around 5:45 p.m. that evening in response to Frank Crossman's call, they found the victim lying on her back, completely nude, in the back bedroom of the house. Her legs were spread wide open, and seminal fluid, which was later determined to contain defendant's DNA,[7] was oozing from her vagina and was also on the carpet directly below her body. She had bruising on the inner part of both thighs; the bruising on her left thigh was located on the upper part of her leg near her "inguinal" or "genital" area.[8] Next to the victim's body lay her blouse, pants, bra, underpants, and shoes. Her pants, though off of her body, "were still fastened in the front," and one of her shoes was lying underneath her right leg and was still tied.

The People's forensic expert, Dr. Fajardo, the chief forensic pathologist for Riverside County, testified that the victim suffered a blunt-impact injury to the back of

---

[7] The prosecution presented the chain of events leading up to the matching of defendant's DNA with the DNA found in the victim's vagina. On appeal, defendant does not contest that the DNA inside the victim belonged to him.

[8] We have ordered and reviewed the exhibits in this case and note here that the jury was shown photographs of the victim's genital area depicting visible bruising on her upper left thigh, near her vagina.

her head that was caused by a significant amount of force, as well as at least three other blows to her head.[9]  The victim had a large hemorrhage on the middle of her neck (near her voice box), as well as various other bruises, scratches, and abrasions around her throat.  The autopsy report concluded that she suffered a broken hyoid bone,[10] and the deputy coroner who was present during the autopsy testified that he personally observed that her hyoid bone had been broken.[11]  The victim also had bruising on her fingers and the backs of her hands, indicating that she tried to defend herself from defendant's attack.

Dr. Fajardo concluded that the cause of death was manual strangulation.  In his opinion, defendant had to have applied continual pressure to the victim's neck for approximately one minute until she lost consciousness and continue to apply pressure for another approximately 30 seconds to cause death by strangulation.  He testified that, while strangulation can be achieved with about seven to nine pounds of pressure, it takes "much more pressure to break a bone."  He estimated that in this case, where the victim is elderly, defendant must have applied "fifteen to thirty" pounds of pressure to the victim's throat when strangling her.  In most strangulation cases that Dr. Fajardo sees, the

---

[9]  To arrive at his opinions, Dr. Fajardo reviewed the victim's autopsy (performed by a Riverside County pathologist who was deceased at the time of trial) as well as the photographs taken during the autopsy and at the crime scene.

[10]  The hyoid bone is located in the neck just under the chin and serves to anchor the neck musculature.

[11]  Dr. Fajardo was unable to conclusively confirm from the photographs that the victim's hyoid bone was broken; however, he opined that a broken hyoid bone is a reasonable explanation for the hemorrhages on the victim's throat muscles overlying the bone.

hemorrhage on the throat area is penny- or dime-sized.  Here, the hemorrhage was the size of a fifty-cent piece, which he characterized as a "significant hemorrhage" that reasonably could have been caused when defendant broke the victim's hyoid bone.

Dr. Fajardo testified that, while he did not see any signs of vaginal tearing or bruising from the autopsy photographs, it is "not an unusual finding to find minimal trauma associated with a rape.  Sometimes there is devastating tears, lacerations, contusions; sometimes there's not."

The police found no sign of forced entry into the West Florida Avenue home.  The jury heard evidence that defendant knew the victim and was familiar with her trailer company and her house.  Defendant's ex-stepfather testified that he had brought defendant to the victim's property many times and had introduced him to the victim.  The prosecutor played the recording of defendant's police interview, in which he initially claimed not to know the victim or recall anything about her death  However, defendant eventually acknowledged during the interview that he knew the victim's husband and that he had been to the trailer company with his stepfather.  He admitted that he mowed the lawn at the victim's husband's house a few miles from the trailer business, but claimed to know nothing of the West Florida Avenue house.  Despite this statement, he recognized a photograph the detectives showed him of the pool in the backyard of the West Florida Avenue house.  This pool was only visible from the backyard; it could not be seen from the street or the front yard.

7

During closing argument, the prosecutor argued that the evidence showed beyond a reasonable doubt that defendant committed both premeditated and deliberate murder and felony murder (with the underlying felony being rape or attempted rape). Regarding premeditation and deliberation, he argued the evidence showed that, at the very least, defendant made the cold and calculated decision to take the victim's life *as* he was strangling her. Regarding felony murder, he argued the evidence showed, at the very least, that defendant committed attempted rape, i.e., that he had sex on his mind when he came to the victim's home, and entering her house was the first in a series of acts done with the intent to have intercourse with her.[12]

b. *The defense*

The defendant called a single witness, Dr. Haddix, a forensic pathology expert, to criticize conclusions in the autopsy report and opine on the state of evidence of sexual assault.[13] Dr. Haddix concluded that the victim died of manual strangulation and opined that it requires about three to five minutes of continual pressure to kill a person by this method, perhaps slightly less if the victim is elderly. She also concluded that the autopsy

---

[12] Here, the rape would be "attempted" in the sense that defendant intended to rape a live victim, but she died before the penetration occurred. (See *People v. Jones* (2012) 54 Cal.4th 1, 62 [a " 'postmortem intercourse' " can constitute an attempt to commit rape, " 'provided it was part of a continuous transaction and the intent to commit rape was formed prior to the murder' "].)

[13] Like Dr. Fajardo, Dr. Haddix reviewed the victim's autopsy report and the autopsy and crime scene photographs to arrive at her opinions.

8

evidence was inconclusive as to whether the sexual assault happened while the victim was still alive.

Dr. Haddix testified that, although the presence of semen inside the victim's vagina showed "that there was some sort of intercourse that happened," because there was no evidence of bruising in or near the vagina, anus, or breasts, it was impossible to determine whether that intercourse had taken place before or after the victim's death.[14] She admitted, however, that in some cases of sexual assault on a living person, there are no observable physical injuries. When asked about the bruising on the victim's thighs, she opined that it could have been caused by something other than a sexual assault.

During closing arguments, defense counsel argued that defendant had not committed premeditated and deliberate murder. She characterized the murder as a spontaneous killing by a traumatized youth who had run away from an abusive domestic situation. She pointed out that, up until the killing, defendant had only gotten in minor trouble, and after the killing, had gone on to lead an uneventful life with "no legal problems in thirty years." She referred to a portion of defendant's police interview when he told the detectives "I'm not a cold-blooded killer," and she referred to the booking deputy's testimony that he detected relief in defendant's voice after he "admitted that he was . . . involved in the death of [the victim]."

---

[14] Certain wounds, such as bruising, only occur if the injury is inflicted on a living person.

9

Defense counsel also argued that the prosecution had not proved beyond a reasonable doubt that defendant committed felony murder. She argued that "there's another reasonable interpretation of how it came to be that there was semen in [the victim's] vagina," namely, that the intercourse and ejaculation occurred after the victim had died. She argued that the fact that there was no evidence of trauma to the victim's vagina corroborated the theory that "the sexual assault occurred after she was dead."[15]

## ANALYSIS

1. *Sufficiency of the evidence of first degree murder*

Defendant argues that his conviction should be reversed because there was insufficient evidence to support a finding of first degree murder under either of the prosecution's theories—premeditated and deliberate murder or felony murder. Because we hold that there is substantial evidence to support a finding of both types of first degree murder, we affirm the conviction.

When considering a challenge to the sufficiency of evidence supporting a conviction, we must " 'review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt.' " (*People v. Jennings* (1991) 53 Cal.3d 334, 364.) Even where the evidence of guilt is primarily circumstantial, the standard of

---

**15** We note here that, as explained *ante*, postmortem intercourse is not dispositive of the felony murder issue. Defendant could still be convicted of felony murder if he attempted to rape a live victim. (*Kelly*, *supra*, 1 Cal.4th at pp. 524-525.)

10

appellate review is the same. (*People v. Holt* (1997) 15 Cal.4th 619, 668 (*Holt*) [" ' " 'If the circumstances reasonably justify the [jury's] findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment' " ' "].) To succeed under a substantial evidence review, defendant must establish that no rational jury could have concluded as it did—it does not matter that "the evidence could reasonably be reconciled with a finding of innocence or a lesser degree of crime." (*People v. Hill* (1998) 17 Cal.4th 800, 849; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1015 (*Hovarter*) [" ' "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise" ' "].)

### a. *Premeditation and deliberation*

Defendant argues that "[n]o evidence suggested [the] careful thought, weighing of considerations and preexisting reflection" necessary to support a finding of premeditation and deliberation. We disagree.

In the context of first degree murder, premeditation means " 'considered beforehand' " (*People v. Mayfield* (1997) 14 Cal.4th 668, 767) and deliberation means a " 'careful weighing of considerations in forming a course of action . . . .' " (*People v. Solomon* (2010) 49 Cal.4th 792, 812). "The process of premeditation and deliberation does not require any extended period of time." (*Mayfield*, at p. 767 [the true test of premeditation is the extent of the reflection, not the length of time].) " 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at

quickly.' " (*Ibid.*; see *id.* at pp. 767-768 [where defendant wrested the gun from and fatally shot an officer during a brief altercation, the jury could reasonably conclude that "before shooting [the officer] defendant had made a cold and calculated decision to take [the officer's] life after weighing considerations for and against"]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002 [aiming weapon at victims whom shooter believed to be rival gang members constituted sufficient evidence of premeditation and deliberation].)

Courts often use the three factors set forth in *People v. Anderson* (1968) 70 Cal.2d 15 as a guide to analyzing whether there is substantial evidence of premeditation and deliberation. (*Id.* at pp. 26-27.) Those three factors are: (1) planning activity (i.e., facts about what defendant did prior to the killing that show he was engaged in activity directed toward killing); (2) motive (i.e., facts about the defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill the victim); and (3) method (i.e., facts about the manner of the killing from which the jury could reasonably infer that defendant had a preconceived design to take the victim's life in a particular way). (*Ibid.*) These factors are not elements of premeditation and deliberation,[16] however, and the California Supreme Court has held that strangulation as

_____

[16] While the *Anderson* factors provide a helpful synthesis of prior case law, our courts have repeatedly stated that they are not prerequisites for proving premeditation and deliberation, nor must the factors " 'be present in some special combination or . . . be accorded a particular weight.' " (*People v. Sanchez* (1995) 12 Cal.4th 1, 32-33, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see generally 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 122, p. 917 [*Anderson* factors are not elements of first degree murder]; *id.* at § 123, p. 918 [*Anderson* factors are not normative but are guides to analysis].)

a manner of killing is sufficient evidence of premeditation and deliberation because its prolonged nature provides ample time for the killer to consider his actions. (*Hovarter*, *supra*, 44 Cal.4th at p. 1020 ["This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act"].)[17]

In *People v. Davis* (1995) 10 Cal.4th 463, the court held that the manner of killing alone supported a finding of premeditation and deliberation because the evidence showed that defendant "pursued [the victim] and then strangled her over a period of *up to five minutes*, at a time when she was severely debilitated and in pain from internal injuries [which had been sustained in a car accident]." (*Id.* at p. 510, original italics; see, e.g., *Hovarter*, *supra*, 44 Cal.4th at pp. 1019-1020 [sufficient evidence of premeditation and deliberation where defendant strangled victim for between five and eight minutes]; *People v. Stitely* (2005) 35 Cal.4th 514, 544 (*Stitely*) [manner of killing suggested premeditation where pathologist testified that pressure had been applied to the victim's neck for a " 'long' " time and the defendant used enough pressure to, *inter alia*, break the victim's thyroid cartilage].) Thus, where strangulation occurs over a prolonged period of

---

[17] Despite the fact that the strangulation in *Hovarter* was accomplished by means of a rope (*Hovarter*, *supra*, 44 Cal.4th at p. 990), the court's reasoning applies to manual strangulation with equal force. The court's premeditation and deliberation conclusion was based on the prolonged nature of the act, not on, e.g., the time it takes to procure the item used for a ligature strangulation. (*Id.* at pp. 1019-1020 [focusing on evidence that the strangulation could have taken between five and eight minutes].)

time, a rational juror could find that the killer committed a premeditated and deliberate murder.

Here, the jury heard expert testimony that the nature and extent of the scratches, abrasions, and hemorrhages to the victim's neck and throat indicate that defendant strangled her with his hands, and that this process could have taken anywhere from one to five minutes. During this period, defendant applied approximately 15 to 30 pounds of pressure to her throat—enough pressure to break her hyoid bone and to cause a significant hemorrhage. Because the evidence supports a finding that defendant applied significant force to the victim's neck for a significant period of time, a reasonable juror could infer that his actions were not the result of accident, mistake, or uncertainty of purpose. Rather, similar to the strangulation cases cited *ante*, the expert testimony on the manner of death and extent of the victim's injuries here supports a reasonable inference that defendant had ample time to consider the consequences of his actions before choosing to end her life. As in *Davis*, *supra*, the evidence in this case (in the form of expert testimony from the defense's pathologist) supports a finding that defendant manually strangled an injured victim for approximately five minutes.

Additional forensic evidence further supports a reasonable inference that defendant had ample time to consider the consequences of his actions as he was attacking the victim. Specifically, the jury heard expert testimony that defendant hit her over the

14

head several times,[18] and that she tried to fight defendant off. These other actions necessarily prolonged the duration of defendant's attack and thus afforded him additional time to deliberate on his decision to kill the victim. We therefore conclude that the evidence regarding the manner in which defendant killed the victim is substantial evidence of premeditation and deliberation in itself.

Defendant's reliance on *People v. Rowland* (1982) 134 Cal.App.3d 1 for the argument that the strangulation was spontaneous as opposed to deliberate is unpersuasive. *Rowland* is a case where the court found, on the limited evidence in the record, that the mere fact that the victim was strangled with an electric cord was insufficient to support a finding of premeditation and deliberation. (*Id.* at pp. 8-10.) Since *Rowland*, the California Supreme Court has held that strangulation that takes place over several minutes affords the killer ample time to think over the consequences of his action. (See *Davis*, *supra*, 10 Cal.4th at p. 510; *Hovarter*, *supra*, 44 Cal.4th at pp. 1019-1020; *Stitely*, *supra*, 35 Cal.4th at pp. 514, 544, cited *ante*.) Not only did *Rowland* predate this precedent, but also it is a case where there was no expert testimony about the length of time it took to kill the victim or about the extent of the victim's injuries. For these reasons *Rowland* does not affect our conclusion that the evidence in this case supports a finding of prolonged strangulation and, as a result, premeditation and deliberation.

---

**18** Dr. Fajardo pointed out to the jury "three[,] at least[,] separate impacts ranging about an inch to an inch and a half" on the back of the victim's head.

Furthermore, defendant's strangulation argument ignores our task in a substantial evidence review. When presented with two reasonable inferences that can be drawn from the evidence, we must uphold the inference that supports the conviction. " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment [citations].' " ' " (*Holt*, *supra*, 15 Cal.4th at p. 668.) Thus, even if it would have been reasonable for the jury to infer that the act of strangulation meant that the killing was spontaneous, the fact that it is also reasonable for it to infer that strangulation indicated premeditation and deliberation requires us to uphold the conviction.

We note here that while the evidence regarding the manner of killing is sufficient to support a finding of first degree murder, there is also evidence tending to support the other two *Anderson* factors—motive and planning. This is because the jury could infer from the evidence of sexual assault at the murder scene (i.e., defendant's semen was in the victim's vagina and the victim had bruising on her upper thighs, including bruising in the inguinal area of her left thigh) that defendant's motive for strangling the victim was " 'to avoid detection for the sexual and other physical abuses he had committed against her.' " (*Hovarter*, *supra*, 44 Cal.4th at p. 1019 [stating that "[t]he motive of eliminating

16

possible witnesses" in cases involving rape is "inferable from the circumstances of such crimes," and finding evidence of premeditation and deliberation based on fact that victim had been sexually assaulted and strangled to death]; see, e.g., *Stitely*, *supra*, 35 Cal.4th at p. 543 [where victim was found lying on the ground with her skirt pulled up, semen in her anus and vagina, and strangulation marks on her throat, court found that "[t]he jury could reasonably have believed that defendant [strangled the victim] 'to silence her as a possible witness to her own sexual assault' "].)

As to planning, courts have found that planning activity can happen during an altercation itself and "*over a short period of time . . . .*" (See, e.g., *People v. Sanchez*, *supra*, 12 Cal.4th at p. 34, italics added [planning activity occurred during the altercation, in the moments that the son sought out and obtained a kitchen knife to kill his father].) Here, the jury could reasonably infer that defendant devised the plan to kill the victim to avoid detection for the sexual assault during or after the sexual assault, and that he applied pressure to her neck for up to five minutes to carry out that plan.

In sum, based on the entire record, a reasonable jury could find that defendant, a young man who knew the 67-year-old victim, entered her home when she was alone for the purpose of sexually assaulting her, and at some point during the attack began the deliberate process of manually strangling her. We conclude that there is substantial evidence in the record to support a finding of premeditation and deliberation, and we affirm the conviction of first degree murder on this ground.

17

b. *Felony murder:  rape or attempted rape*

Defendant contends that his felony murder conviction should be reversed because there is insufficient evidence that he "formed an intent to rape [the victim] prior to or during the murder."  We disagree.

Murder perpetrated in the course of a rape or attempted rape is felony murder, which is first degree murder.  (§ 189.)  The murder is considered perpetrated in the course of a rape or attempted rape if the acts were part of a "continuous transaction."  (*People v. Booker* (2011) 51 Cal.4th 141, 175 (*Booker*).)  The requisite mental state for felony murder is a specific intent to commit the underlying felony.  (*People v. Cavitt* (2004) 33 Cal.4th 187, 197.)

The Penal Code defines rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator [¶] . . . [¶] against the person's will by means of force [or] violence."  (§ 261, subd. (a)(2).)  Attempted rape occurs where "the defendant formed the specific intent to commit the crime of rape and performed a direct but ineffectual act, beyond mere preparation, leading toward the commission of a rape." (*People v. Rundle* (2008) 43 Cal.4th 76, 138 (*Rundle*), overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see § 21a.)  "A defendant's specific intent to commit rape may be inferred from the facts and circumstances shown by the evidence."  (*People v. Clark* (2011) 52 Cal.4th 856, 948 (*Clark*).)  Evidence of rape or attempted rape includes "trauma to the body or sexual organs, or the presence of the perpetrator's bodily fluids."  (*Rundle*, at p. 139.)

18

Here, the victim was found bearing the indicators of rape—she was completely nude with her legs spread wide apart, had sustained bruising on her thighs—including in the inguinal area near her genitalia—and defendant's semen was inside her vagina. This evidence alone substantially supports a finding of rape.

Defendant argues that he had intercourse with the victim after he killed her and, as such, he cannot be guilty of rape.[19] He contends that the evidence of sexual assault is insufficient to support a conclusion that the assault happened when the victim was alive. To support his postmortem intercourse theory, defendant asserts that: (1) she suffered no visible vaginal injuries, (2) her clothes were not torn or ripped, and (3) her defensive injuries were "likely sustained while deflecting the strangulation."

Defendant's argument fails under a substantial evidence review. As explained *ante*, we must accept the reasonable inferences supporting the verdict over any inferences (even if reasonable) proffered by defendant. (See *Rundle*, *supra*, 43 Cal.4th at p. 137 [if there is substantial evidence supporting the verdict, it is insufficient for a defendant to cite to "various items of evidence in isolation . . . arguing each could be viewed as pointing to his innocence of the charge rather than his guilt. Even if defendant's premise is correct"].) Here, reasonable inferences can be drawn from the evidence defendant cites *ante* that support a finding of rape.

---

[19] Defendant cites to the rule that the crime of rape requires a live victim (see, e.g., *Kelly*, *supra*, 1 Cal.4th at p. 524) and to the rule that where the intent to commit the underlying felony is formed after the victim is dead, the felony murder doctrine is not applicable (*People v. Jeter* (1964) 60 Cal.2d 671, 676-677).

First, defendant's focus on the lack of injuries to the victim's vagina ignores the fact that she sustained bruising to her upper thighs, including in the inguinal area of the leg, which is near the genitals. While a juror could reasonably infer that these thigh injuries were caused by something other than sexual assault, for example, from defendant kneeling between the victim's legs while he strangled her, a juror could also reasonably infer that they were caused by defendant's attempts to spread her legs and penetrate her. Furthermore, the absence of vaginal injuries is not in itself dispositive on the issue of rape. (See, e.g., *Stitely*, *supra*, 35 Cal.4th at p. 542 ["the lack of vaginal injury does not preclude the jury from finding rape or prevent this court from upholding that determination on appeal"].) Both forensic pathology experts testified that there can be instances of rape where the victim suffers no visible physical injuries to the vagina.

Second, regarding the state of the victim's clothing, the location and condition of the items supports a reasonable inference that they were taken off by someone other than the victim, in a hurry, with no time to unfasten or untie some of them. The fact that a reasonable juror could have also concluded that defendant slid the victim's fastened pants off her after she was dead is of no consequence to the conviction in light of a reasonably plausible explanation that supports the conviction.

Third, regarding the defensive wounds, again, while it is reasonable to infer that they were sustained during an attempt to deflect strangulation, it is equally reasonable to infer that they were sustained during an attempt to deflect a sexual assault. This is

20

especially so given the presence of defendant's semen in the victim's vagina and the bruises on her thighs.

Moreover, even if we accept defendant's argument that there was no struggle during intercourse, the jury could still reasonably infer that the victim was raped. Namely, where there is an absence of "signs of a struggle—such as trauma to [the victim's] body or damage to her clothing" a jury can reasonably infer that this "was the result of her surrender to defendant's demands in the hopes of surviving the ordeal, rather than proof she was . . . dead when she was undressed." (*Rundle*, *supra*, 43 Cal.4th at p. 139.)

Even assuming that defendant did not have intercourse with the victim until after she died, there is nevertheless substantial evidence that he committed *attempted rape* during the same continuous transaction as the murder. Specifically, the two elements of attempted rape are substantially supported by the record—the jury could reasonably find that defendant formed the intent to rape the victim *before or as* he strangled her and it could find that his physical attack on her was a direct act toward the commission of the rape. (See *Clark*, *supra*, 52 Cal.4th at p. 948 ["The crime of attempted rape has two elements: (1) the specific intent to commit the crime of rape and (2) a direct, although ineffectual, act toward its commission"].) That the intercourse defendant was intending to perform before or as he murdered the victim actually occurred after she was dead is of no consequence to his conviction. (See, e.g., *Booker*, *supra*, 51 Cal.4th at p. 175 ["Intercourse after death does not necessarily negate the felony-murder rule" and may

21

constitute attempted rape if the defendant intended to rape a live victim]; *People v. Kelly* (1992) 1 Cal.4th at 495, 524-526 [same].)

Defendant argues that the facts here are analogous to cases where courts found insufficient evidence of rape or attempted rape. However, the cases defendant cites are inapposite because they involve murders where the *only* evidence of rape or attempted rape is the nudity or partial nudity and the positioning of the victims' dead bodies.

Defendant cites to *People v. Craig* (1957) 49 Cal.2d 313 (*Craig*), where the victim was found dead at a service station, lying on her back under a car with her legs "spread slightly apart." (*Id.* at p. 316.) She was wearing a raincoat over a nightgown and underwear, all of which had been ripped to some extent. (*Ibid.*) The court rejected the argument that the state of the victim's clothing and her slightly spread legs supported a finding of rape or attempted rape, reasoning that the evidence was consistent with the fact that she had been dragged several feet. (*Id.* at p. 319.) The court concluded that— without evidence that defendant had ever seen the victim before he spontaneously murdered her or evidence "of semen or spermatazoa . . . on either the clothing of the decedent or the defendant"—the record demonstrated "no more than the infliction of multiple acts of violence on the victim." (*Id.* at pp. 317-319.) Defendant also cites to *People v. Johnson* (1993) 6 Cal.4th 1, where the court found that the victim's partially unclothed body (the only potential evidence of rape or attempted rape) was insufficient evidence to support a finding of felony murder. (*Id.* at pp. 39, 42.)

In relying on these cases, defendant overlooks the fact that, while nudity or body position may not *by themselves* be sufficient evidence of rape or attempted rape, they are nevertheless relevant circumstances to take into account, especially where there is other evidence of a sexual assault. (See *Rundle*, *supra*, 43 Cal.4th at p. 139 [stating that while "the circumstance of the victim's being found partially or wholly unclothed is not *by itself* sufficient to prove a rape or an attempted rape has occurred, such a fact . . . is one of the relevant circumstances," as is a lack of "evidence tending to show a sexual assault did *not* occur"], italics added.)

Here, unlike in *Craig* and *Johnson*, there is ample evidence of rape or attempted rape aside from the victim's nudity and the positioning of her legs. Not only did the victim exhibit bruising near her genitals, but also—more significantly—defendant's semen was found inside her vagina. (See *Craig*, *supra*, 49 Cal.2d at p. 317 [presence of seminal fluids on the victim would constitute evidence of rape or attempted rape].)

We conclude that there is substantial evidence in the record to support a conviction of felony murder based on rape or attempted rape, and we affirm the conviction of first degree murder on this ground as well.

2. *Admissibility of defendant's statements to the police*

Defendant contends that the trial court erred when it admitted statements he made to detectives during an interview and to a deputy during booking. We conclude the statements were properly admitted.

a. *Defendant's statements to the detectives*

During his arrest on February 2, 2011, Detective Dill and another detective interviewed defendant about the victim's murder. After advising him of his *Miranda* rights, the detectives asked him if he had any questions about his rights and he said, "Not at this time, but if I change my mind I'll let you know. [¶] I want to cooperate with you guys . . . ."

The detectives told defendant that his name had come up in relation to a 1980 case involving the victim. Defendant denied knowing the victim, but said that he knew her husband from doing odd-jobs for his trailer company and from mowing the lawn at one of his houses (which was not the West Florida Avenue house). After the detectives told him that there was overwhelming evidence, including DNA, that he had been at the victim's house on West Florida Avenue the day she was murdered, defendant said, "I think I probably should change my mind about the lawyer now. I, I need advice here. Don't you guys think I need some advice here? I think I need some advice here."

The detectives told defendant that they would take a break to let him "think about it for a few minutes," that a lot of people had to live with the murder for 31 years, and that only he could tell his side of the story. Defendant agreed this was "fair" and stated, "forty-eight[-year-old] Shelby doesn't want to have to take care of anything that seventeen[-year-old] Shelby did."

After the break, the detectives asked defendant if he wanted to know what evidence they had against him and he replied that he did not. Defendant then stated, "I

24

really don't want to continue the interview without at least seeking some advice. You guys understand right? And I understand what you have to do and let's just do it, I don't want to talk about it anymore. Not without some advice."

Before trial, defendant moved to suppress his statements, arguing that the entire interview should be excluded as involuntary or, in the alternative, that everything after his first reference to an attorney (i.e., "I think I probably should change my mind about the lawyer now. . .") should be excluded because that statement was a clear invocation of his right against self-incrimination. The court found that defendant's first clear invocation of his right to counsel was not his first reference to counsel but rather his second: "I really don't want to continue the interview without at least seeking some advice." This second reference came soon after the first reference and the ensuing break. The court ruled that everything up to the invocation was admissible and that everything after and including the invocation would be excluded.

At trial, the prosecutor played a recording of the interview for the jury, but stopped the recording when the detectives took a break. Hence, the jury heard the following incriminating statement that came immediately after defendant's first reference to an attorney: "forty-eight[-year-old] Shelby doesn't want to have to take care of anything that seventeen[-year-old] Shelby did."

Defendant argues that the trial court's ruling was error. He asserts that the statement, "I, I think I probably should change my mind about the lawyer now. I, I need advice here. Don't you guys think I need some advice here? I think I need advice here,"

25

was a clear and unequivocal invocation of his right to counsel, and that it was error to admit the incriminating statement that followed.

In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105 (*Bacon*).) Where, as here, a defendant's statements to the police are undisputed, "we engage in a de novo review of the legal question of whether the statement at issue was [admissible]." (*Ibid.*)

If a defendant waives his right to counsel after receiving *Miranda* warnings, police officers are free to question him. (*North Carolina v. Butler* (1979) 441 U.S. 369, 372-376.) If, postwaiver, a defendant requests counsel, the officers must cease further questioning until a lawyer has been made available or the defendant reinitiates. (*Edwards v. Arizona* (1981) 451 U.S. 477, 484-485.) However, the request for counsel must be articulated "unambiguously" and "sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis v. United States* (1994) 512 U.S. 452, 459 (*Davis*) [whether a defendant has invoked the right to counsel is an "objective inquiry"].) If a defendant's reference to an attorney is ambiguous or equivocal in that "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, [precedent does] not require the cessation of questioning." (*Ibid.*)

26

Courts have found references to requests for attorneys to be objectively equivocal where a defendant uses conditional language or ambiguities. For example, in *Bacon*, the court held that the defendant's statement—" 'I think it'd probably be a good idea for me to get an attorney' "—was equivocal and ambiguous for its use of the " 'several ambiguous qualifying words . . . 'I think,' 'probably,' and 'it'd.' " (*Bacon*, *supra*, 50 Cal.4th at pp. 1104-1105; see, e.g., *Davis*, *supra*, 512 U.S. at pp. 455, 462 [the statement " 'Maybe I should talk to a lawyer' " was not an objectively clear and unambiguous request for counsel]; *Stitely*, *supra*, 35 Cal.4th at p. 535 [the statement " 'I think it's about time for me to stop talking' " was an ambiguous reference to the defendant's *Miranda* rights]; *People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 215-216, 219 [the statement " 'If you can bring me a lawyer . . . that way I can tell you everything that I know and everything that I need to tell you and someone to represent me,' " was ambiguous and equivocal as well as "conditional in that it began with an inquiry as to whether a lawyer *could* be brought to defendant"], original italics.)

Here, defendant's statement—"I think I probably should change my mind about the lawyer now. . . . I think I need some advice here"—contains language that is conditional ("should") and equivocal ("I think" and "probably"). As the court held in *Bacon*, these ambiguous qualifying words convey to a reasonable officer only that defendant might want to invoke his right to counsel, not that he is unambiguously expressing his desire to terminate the interview. (*Bacon*, *supra*, 50 Cal.4th at pp. 1104-1105.) Under our *Miranda* cases, words like "probably" and "I think" indicate to an

27

objective listener that defendant did not have a clear intention to invoke his right to counsel, but was only considering the possibility of doing so. (See, e.g., *ibid.*)

Furthermore, that defendant did not intend to terminate the interview is clear from the exchange that immediately followed. In response to his reference to an attorney, the detectives told defendant that they would take a break so he could "think about it for a few minutes." The detectives told defendant that after a few minutes they would "come back and talk" and defendant agreed this was "fair." When the detectives came back from the break they asked defendant if he wanted to know the evidence they had against him and he said, "Actually I don't want to hear it. . . . I really don't want to continue the interview without at least seeking some advice." This statement contains direct and unambiguous language of intent ("I really don't want to") and demonstrates that defendant knew how to convey his request for counsel clearly and straightforwardly. When compared to this unambiguous request for counsel, it was reasonable for the detectives to interpret defendant's first reference to a lawyer as equivocal. We therefore conclude that the defendant's first invocation of his right to counsel was when he said "I really don't want to continue the interview without at least seeking some advice," not when he said "I think I probably should change my mind about the lawyer now."

The three cases defendant cites in support of his argument that his first reference to an attorney was a clear and unambiguous invocation are unpersuasive. Two of the cases are inapposite because they involve undisputed invocations of the defendants' *Miranda* rights and the specific issue of whether subsequent incriminating statements by

28

defendant were spontaneous or the result of post-invocation interrogation. (See *People v. Sims* (1993) 5 Cal.4th 405, 437, 442 [noting that after officer advised defendant of his *Miranda* rights, "[d]efendant stated he would not waive his rights and signed the admonition form so indicating," and finding that defendant's subsequent confession "was not spontaneous or volunteered, but rather the product of the 'functional equivalent' of interrogation"]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1025, 1035-1037 [noting that after police "informed defendant of his *Miranda* rights . . . [and] asked, 'Do you wish to give up the right to remain silent?' " defendant replied, " 'No. I want my lawyer,' " and finding that subsequent questioning of defendant was interrogational].)

The third case, *People v. Peracchi* (2001) 86 Cal.App.4th 353, is inapposite because there the court found that the officer's follow up questions to defendant's statement " ' "I don't think I can talk," ' " clearly evidenced that the officer *acknowledged* that the defendant had invoked his right to remain silent and that he was asking him *why* he had invoked his rights. (*Id.* at pp. 358, 361 ["the questions here were not directed at whether [the defendant] was invoking his right to silence . . . . Instead, the questions asked why he did not wish to waive his rights. This inquiry itself assumes that [the defendant] had invoked his right to remain silent. Officers have no legitimate need or reason to inquire into the reasons why a suspect wishes to remain silent."].) In other words, none of these cases shed light on the specific issue here—the effect of language like "I think" and "probably" on a reasonable officer's interpretation of whether a defendant is invoking his *Miranda* rights.

Defendant's argument that the detectives were required to ask clarifying questions to determine what he meant when he said that he should "probably" change his mind about the lawyer is incorrect. Officers are not required to ask clarifying questions when a suspect makes an ambiguous or equivocal statement. "[W]hen the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity.' " (*Davis*, *supra*, 512 U.S. at p. 460; see *Bacon*, *supra*, 50 Cal.4th at pp. 1104-1105 [officers were not required to cease questioning or ask clarifying questions in response to defendant's equivocal and ambiguous statement of " 'I think it'd probably be a good idea for me to get an attorney' "].)

We find no error in the trial court's admissibility ruling.

b. *Defendant's statements during the booking process*

After his interview with the detectives, defendant was taken to the Southwest Detention Center for booking and a deputy from the Riverside County Sheriff's Department administered defendant's fingerprinting. At trial, the prosecution called the deputy as a witness. The deputy testified that during fingerprinting he asked defendant when he had last been booked. Defendant responded that he had last been booked in October 2010, and added that "he knew he was caught when they took his DNA sample last time he was booked in." The deputy testified that in response to this statement he

30

"asked him why," and defendant replied, "Well, how do you get away with leaving DNA inside her? I knew eventually I'd be—I knew I'd be caught sooner or later."

Before trial, defendant moved to suppress his statements to the deputy on the ground that the deputy's questions were designed to interrogate. The trial court ruled that the statements were admissible, finding that the deputy did not intend to elicit incriminating information from defendant and that the situation did not amount to a custodial interrogation. On appeal, defendant renews his argument, asserting that the deputy's questions did not fall under the "routine booking question exception" to *Miranda's* requirements.

As with defendant's statements to the detectives, his statements to the deputy are undisputed, and therefore we review their admissibility de novo. (*Bacon*, *supra*, 50 Cal.4th at p. 1105.) Whether custodial questioning falls under *Miranda's* booking exception depends on " 'whether the questions are legitimate booking questions or a pretext for eliciting incriminating information.' " (*People v. Williams* (2013) 56 Cal.4th 165, 187.) Booking questions that do not rise to the level of interrogation are those questions " 'normally attendant to arrest and custody,' " i.e., questions police ask in the conduct of their "normal administrative duties." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86-89 [guarding officers' casual conversation with the defendant during the booking process that "never mentioned the offense or distinctions between right and wrong, but concerned neutral topics about defendant's interests and life" were "permissible casual conversation normally attendant to a custody situation" even though

31

they elicited incriminating responses from the defendant]; see, e.g., *People v. Gamache* (2010) 48 Cal.4th 347, 384, 387-388 [booking deputy's questions during fingerprinting about whether the defendant had previously been in the military were not interrogational even though the defendant offered incriminating remarks in response].) "The fact that information gathered from these routine questions or casual conversations turns out to be incriminating does not alone render the statements inadmissible." (*Andreasen*, at p. 87.) The routine booking question exception applies "even when a defendant has already received *Miranda* warnings and invoked his or her rights." (*Ibid.*)

In *People v. Gamache*, *supra*, 48 Cal.4th 347, the deputy taking the defendant's fingerprints asked him whether he had ever served in the military and whether he enjoyed it. (*Id.* at p. 384.) The defendant responded that he had and then continued on, stating " 'I fucked up. I knew better. I should have used a .45.' " (*Ibid.*) The deputy then asked the defendant "what had happened," and the defendant replied with several incriminating statements describing how he had murdered a woman. (*Ibid.*) On appeal, the court held that the defendant's incriminating statements were admissible because the deputy's military questions were "innocuous" routine booking questions and his follow up questions in response to defendant's remarks were " ' "neutral inquir[ies]" ' " that were not interrogational. (*Id.* at pp. 387-388.)

Similarly here, the deputy's question about the last time defendant was booked is innocuous and common to the booking process, and his response to defendant's seemingly incriminating response (i.e., "why" did he know he was "caught") was a

neutral follow up question. At the suppression hearing, the deputy testified that the questions he asked of defendant were routine ("I talked to him the same way I talk to everybody being booked in"), and that he had no information about the charges against defendant. We thus conclude that it is clear from the record that the deputy's questions fall squarely under the routine booking exception and that the trial court did not err in admitting the deputy's testimony about defendant's incriminating response to those questions.[20]

3. *The trial court's response to the deliberating jury's question*

At trial, the court instructed the jury on, among other things, the definition and elements of first degree and second degree murder. The court first defined murder, then it defined the elements of first degree murder for each of the prosecution's theories (premeditated and deliberate murder and felony murder). The court also explained that "[m]urder which is not of the first degree is murder of the second degree."[21]

Because the prosecution had charged defendant with first degree murder under two different theories, the court instructed the jury that it could not find defendant guilty of first degree murder unless each juror agreed that the prosecution had proved beyond a

---

[20] I.e., defendant's statement, "Well, how do you get away with leaving DNA inside her? I knew eventually I'd be—I knew I'd be caught sooner or later."

[21] The trial court used the following instructions regarding first and second degree murder: for the definition of murder and malice aforethought—the 1979 version of CALJIC 8.10 and 8.11, for the definition of deliberate and premeditated murder—the 1979 version of CALJIC 8.20, and for the definition of felony murder—CALCRIM 540A.

reasonable doubt that defendant had committed first degree murder.  The court further instructed that each juror need not agree, however, on the same *theory* of first degree murder in order to convict defendant of that offense.

During deliberations, the jury sent a note to the court that read, "Can you clarify second-degree murder?  First-degree versus second-degree?  Differences?"  The court proposed the following response to the prosecution and defense:  "Murder is defined in CALJIC Instruction 8.10/8.11.  Murder of the first degree is defined in CALJIC 8.20, which is deliberated, premeditated murder, and also defined in Instruction 540A, which is felony murder.  All other murder is of the second degree."

Defense counsel stated that the response was acceptable, but the prosecutor remarked, "I don't know that's going to clarify what I assume their question is, you know, that there are two theories of first, and second is only as to the first theory without premeditation and deliberation."  The court stated, "I didn't read that into the question.  I think this answers the question.  If it doesn't, we will get another question."  After this exchange, defense counsel again voiced its agreement with the court, stating "[t]he court's response is acceptable to defense."  After deciding its response was appropriate, the court gave it to the jury.

Defendant claims that the trial court incorrectly responded to the jury's question.  We conclude that the error was not preserved for appeal due to defendant's approval of the court's response and that, in any event, the claim is meritless.

34

### a. *Defendant waived any claim of error*

A trial court's response to a deliberating jury's question regarding the elements of a charged crime is governed by section 1138. This section requires the court to give notice to the prosecutor and defendant or defense counsel before providing the jury with any information "on any point of law arising in the case." (§ 1138.)

"When a trial court decides to respond to a jury's note, counsel's silence waives any objection under section 1138." (*People v. Roldan* (2005) 35 Cal.4th 646, 729 (*Roldan*).) Counsel's "[a]pproval of the court's action, even though it might have been a technical violation of section 1138 . . . cures any possible error." (*Ibid.*; see e.g., *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1193 [where deliberating jury sought clarification on penalty instructions, defendant's approval of the court's response waived his claim on appeal that the response was error].)

Here, because the court presented defense counsel with the full text of its proposed response and defense counsel stated that the response was "acceptable," defendant has waived any possible error in the response.

We disagree with defendant's contention that under *People v. Frye* (1998) 18 Cal.4th 894 and *People v. Loza* (2012) 207 Cal.App.4th 332 his claim is not waived because it implicates his constitutional right to a fair trial. Neither of these cases holds that a section 1138 claim cannot be waived because it implicates a defendant's constitutional right to a fair trial. In *Frye*, the court explicitly refused to decide the issue of whether the violation of section 1138 at issue implicated defendant's constitutional

right to a fair trial such that his claim could not be waived. (*Frye*, at p. 1007 ["We need not resolve defendant's claim on the basis of counsel's acquiescence, however"].) In *Loza*, the court held that the *defendant had forfeited her claim of trial court error under section 1138* by failing to object at trial.[22] (*Loza*, at p. 350.)

### b. *The trial court did not err*

Even if defendant had not waived his claim of a violation of section 1138, the trial court's response was not error. "When a jury asks a question after retiring for deliberation, '[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law.' " (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882) "This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Montero* (2007) 155 Cal.App.4th 1170, 1179.) Indeed, comments or additional explanations " ' "diverging from the standard are often risky." ' " (*Ibid.*) We review a trial court's decision regarding additional explanations under section 1138 under the abuse of discretion standard. (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746 (*Waidla*).)

Here, the original instructions regarding first and second degree murder were taken from CALCRIM as well as the 1979 version of CALJIC and were full and

---

[22] The court proceeded to analyze the section 1138 issue under the defendant's claim of ineffective assistance of counsel. (*Loza*, *supra*, 207 Cal.App.4th at pp. 350-352.)

complete in themselves. The instructions set forth the elements of murder, of the premeditation and deliberation required for first degree murder, and of first degree felony murder based on rape or attempted rape. The instructions then explained that "[m]urder which is not of the first degree is murder of the second degree." These instructions are sufficiently clear on the point about which defendant is concerned—that the jurors understood that if they found he murdered the victim but were unable to find he premeditated and deliberated the murder *and* were unable to find he committed felony murder, they were to convict him of second degree murder.

Because the original instructions were full and complete, the trial court had discretion to respond to the deliberating jury's question just as it did, namely, by rereading the instructions regarding those crimes. Indeed, because the original instructions correctly instructed the jury as to what constitutes first versus second degree murder, any additional comment on the instructions could have risked weighing against the defendant's interest. (See *Roldan*, *supra*, 35 Cal.4th at p. 730 ["By declining to object, a defense attorney might believe [the court's response] is favorable to his or her client," and courts should not "give defendant a second bite at the apple" on appeal].) Indeed, such a concern may have informed defense counsel's approval of the court's response. We conclude that the trial court did not abuse its discretion by determining that no additional explanation beyond the instructions was necessary.

Defendant argues that the trial court's specific error was that it did not tell the jurors that "second degree murder mean[s] murder without premeditation and

37

deliberation." Because this response would have been technically incorrect, defendant's claim of error necessarily fails.

Defendant's preferred response is incorrect because it ignores the fact that the prosecution charged defendant with first degree murder both under a premeditated and deliberate murder theory *and* under a felony-murder theory. Because defendant was charged under both theories, a lack of premeditation and deliberation would not necessarily mean that defendant must instead be convicted of second degree murder. In other words, a jury could find no premeditation and deliberation but *still find that defendant had committed first degree murder* (under the felony-murder theory). Moreover, even if defendant's preferred explanation were correct and appropriate, his claim fails under an abuse of discretion review. The choice of multiple correct and appropriate ways to respond to a deliberating jury's questions lies solely with the trial court and it is not error to choose one appropriate response over another. (See *Waidla*, *supra*, 22 Cal.4th at pp. 745-746 [court exercises supervision over a deliberating jury and may exercise its discretion regarding how to respond to jury questions].)

Defendant also argues that the jury's question demonstrated that it did not understand the instructions for first and second degree murder and, as a result, the trial court was required to *clarify* the instructions (as opposed to rereading them). Defendant's reliance on *Loza*, for support is misplaced. That case involved instructions on the intent element of aiding and abetting which were regarded as " 'confusing' " and requiring modification. (*Loza*, *supra*, 207 Cal.App.4th at pp. 354-357, citing to *People v. Nero*

38

(2010) 181 Cal.App.4th 504, 518 ["the aider and abettor instructions—namely, CALJIC No. 3.00—are confusing and should be modified"].) Moreover, the court found that the jury's question regarding the requisite intent for aiding and abetting indicated that it was going to apply incorrect law in reaching its verdict. (*Loza*, at pp. 354-355.) Here, unlike in *Loza*, the original instructions on first and second degree murder were straightforward and complete and there was no indication from the jury's question that it was not going to follow the correct law in reaching its verdict.

      c. *Any error was harmless*

Assuming the trial court erred and defendant did not waive the error by approving the court's response, the error is not reversible unless it was prejudicial. Defendant argues that he would have obtained a more favorable outcome had the trial court instead responded, "second degree murder [means] murder without premeditation and deliberation." We do not agree.

A trial court's "failure under section 1138 to adequately answer the jury's question 'is subject to the prejudice standard of *People v. Watson* [(1956)] 46 Cal.2d 818, 836,' i.e., whether the error resulted in a reasonable probability of a less favorable outcome." (*Eid*, *supra*, 187 Cal.App.4th at p. 882 [in this context, "reasonable probability" means ' "a *reasonable chance*, more than an *abstract possibility*,' of an effect of this kind"].)[23]

---

[23] Defendant is incorrect that the harmless error standard articulated in *Chapman v. California* (1967) 386 U.S. 18 applies to the error alleged here. The single authority he cites for this proposition, *People v. Giardino* (2000) 82 Cal.App.4th 454, 470-471, applies the *Watson* prejudicial error test to the trial court's instructional error under section 1138—it does not apply the *Chapman* standard. (*Id.* at p. 467 [a " 'violation of

*[footnote continued on next page]*

Here, contrary to defendant's contention, it is not reasonably probable that the jury would have acquitted him of first degree murder if the court had given defendant's preferred response. As explained, *ante*, defendant's preferred response is legally incorrect—first degree murder does not mean only murder without premeditation and deliberation, it also covers all other murders that are not of the first degree. Had the prosecution only charged defendant with premeditated and deliberate murder, defendant's preferred response would not have been legally incorrect in the context of his trial. However, because the prosecution charged defendant with felony murder, which does not require premeditation and deliberation, defendant's preferred response would misinstruct the jury on the definition of second degree murder.

In addition to being an incomplete (and thus incorrect) statement of the law if given on its own, defendant's preferred response was for all practical purposes included within the response the trial court gave to the jury. By referring to the definition of premeditated and deliberate murder as first degree murder and then explaining that all murder other than first degree murder is second degree murder, the trial court conveyed to the jury the point defendant wanted made (i.e., that murder without premeditation and deliberation is second degree murder) along with the additional implicit (and correct) explanation that felony murder is not second degree murder. In other words, even assuming the court's response was error, it nevertheless conveyed to the jury the same

section 1138 does not warrant reversal unless prejudice is shown.' "], citing *People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

40

information (albeit in a more complete manner) that defendant's preferred response would have conveyed.

In the alternative, defendant argues that the effect of the error on the jury's verdict is unknowable, and, where the effect is unknown, a court cannot conclude that the error was not prejudicial. There is no authority for such a generalized rule and the cases defendant cites are inapplicable to the facts here. Namely, in both cases the error was the trial courts' denial of the juries' request for the rereading of testimony, which the reviewing courts found to have infringed on " '[the jury's] fundamental right to be apprised of the evidence upon which they [were] sworn conscientiously to act.' " (*People v. Litteral* (1978) 79 Cal.App.3d 790, 796; see *id.* at pp. 793-797 [concluding that the trial court's refusal to read the requested testimony was prejudicial error in light of the fact that there was evidence that "at least two jurors had reasonable doubts about the guilt of one or both of the defendants"]; *People v. Henderson* (1935) 4 Cal.2d 188, 193-194 [where the jury asked for a reread of the testimony relating to a particular issue and the court read some testimony but left out certain testimony that was beneficial to the defense, the error was prejudicial because the jury might have reached "an opposite conclusion had they had the benefit of having reread to them that which they requested"].) These cases do not affect our conclusion, which is that defendant was not prejudiced by the trial court's response on the legal question of the difference between first and second degree murder.

DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.