Filed 5/25/16  P. v. McLean CA4/1
Received for posting 5/26/16

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KYLE ROGER McLEAN,<br><br>Defendant and Appellant. | D069903<br><br><br><br>(Super. Ct. No. SWF1301920) |

APPEAL from a judgment of the Superior Court of Riverside County, Stephen J. Gallon, Judge.  Affirmed.

Cannon & Harris and Gregory L. Cannon, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Kyle Roger McLean of first degree murder (Pen. Code,[1] § 187, subd. (a)).  It found true allegations that at the time McLean committed the offense he

---

[1]    All statutory references are to the Penal Code.

was released from custody pending trial on a felony (§ 12022.1) and the victim was 70 years old or older (§ 368, subd. (b)(3)(B)). The jury found not true a special circumstance allegation that McLean killed the victim to prevent her from testifying in a criminal proceeding (§ 190.2, subd. (a)(10)). The trial court sentenced McLean to 25 years to life in state prison and ordered McLean to pay restitution as well as various fines and fees. On McLean's request and with the People's concession, the court struck the section 12022.1 and section 368, subdivision (b) enhancements.

McLean contends the trial court prejudicially erred by failing to instruct the jury on voluntary manslaughter as a lesser included offense to murder under the theory of imperfect self-defense. He maintains the court's error violated his due process right to a fair trial and his Sixth Amendment right to a jury determination of every material issue in the case, requiring reversal under both the state and federal standards of prejudice. Because the record does not contain substantial evidence supporting instruction on a theory of imperfect self-defense, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2013, McLean choked and killed his then 71-year-old grandmother, Catharine Sutton, placed her body in the trunk of her car, then a locked bin, and eventually dumped it off a remote mountain cliff. McLean's defense was that the killing was involuntary manslaughter because he was provoked by Sutton and killed her in a heat of passion due to their sudden quarrel, and alternatively that his voluntary intoxication negated his intent to kill or ability to premeditate and deliberate for purposes of first degree murder. He claimed he had been abusing a large amount of drugs and alcohol in

2

the days leading to Sutton's death, and on July 11, 2013, he and Sutton got into an argument and physical tussle during which he blacked out and choked Sutton to death.

*Events in the Weeks Before and Weekend of Sutton's Death*

In June 2013, McLean, who was already on probation and living with Sutton after having been kicked out of his father's house, was arrested by police. A police officer had responded to a neighbor's call concerning a man in Sutton's cul-de-sac and talked to Sutton about McLean being on probation, which eventually led the officer to search McLean's room and arrest him for narcotics possession.

McLean was again arrested on the day of Sutton's death. That day, Neil Erickson had driven McLean and other friends of McLean's to Sutton's house, where a neighbor saw Erickson spraying graffiti on a wall. Police arrested both McLean and Erickson for vandalism, but eventually released McLean. When police were putting McLean in the police car, McLean overheard Sutton telling the officer that she was having issues with McLean; that he was on drugs and maybe she needed to kick him out of her house. At the police station, Erickson observed that McLean was agitated and yelling.

When McLean returned to Sutton's house after his release, an alarm technician working there observed that McLean was highly aggravated and upset that Sutton did not pick him up. The technician saw McLean and Sutton yelling and cursing back and forth at each other; he felt McLean was verbally abusing Sutton. At one point, McLean accused the technician of being with law enforcement. The technician did not see Sutton strike, push or hit McLean. Eventually McLean went to another part of the house and things got quiet. The technician left at about 6:10 p.m. and intended to return to complete

3

his repairs the next day. When the technician left Sutton's house, she was alive and her surveillance cameras were operable. He could not reach Sutton the next day, and at some point spoke with McLean, who told him his grandmother was not home, something had come up, and she would be gone for the day.

Tori M., who was dating McLean at the time, testified that at about 5:00 p.m. on the day of Sutton's death, McLean called and told her he had been arrested for vandalism; that Sutton had called the police on him. McLean told her he was going to try to borrow Sutton's car and would call Tori M. back. In his next phone calls, McLean sounded anxious and out of breath. When Tori M. got in Sutton's car, she noticed McLean's gold chain was broken. McLean handed her Sutton's purse and told her to go through it to see if there was money in it. He also asked her to take the battery out of Sutton's phone. Several days later, McLean asked Tori M. to sign two of Sutton's checks so they could obtain money to purchase drugs.

That evening, McLean asked Erickson to meet him and showed him Sutton's body, which was in the trunk of Sutton's car. Another friend of McLean's, Kristin L., was with them. Erickson saw there was a belt pulled tight around Sutton's neck. McLean punched the body in the upper back to prove Sutton was dead. McLean told Erickson that "[t]he bitch snitched" about the graffiti and that he killed her. Erickson saw two spots of blood on McLean' shirt and a cut on McLean's hand. Kristin L. also saw blood on a shirt McLean was holding and a cut on his wrist or hand. She asked why McLean would kill his grandmother, and McLean said it was because she was going to snitch and he would get ten years of prison. McLean later told Erickson that Sutton had cut him with her

4

fingernails; that she was a fighter and a "tough son-of-a-bitch" who "fought back." The next day, Erickson and McLean purchased supplies, including tarp, machetes, bleach and gloves, to clean Sutton's house of fingerprints and dispose of her body.

During the weekend of July 11, 2013, McLean and another friend went to see Christopher Manwaring, who at times sold McLean drugs. McLean wanted to sell Manwaring household items and a car. McLean was acting oddly and handed Manwaring his phone to check a text message; when Manwaring did so, he saw that McLean had typed, "Just killed a bitch." When Manwaring asked McLean who he had killed, McLean said, "Snitch. Snitch." Manwaring gave McLean the phone number of a person who was looking for a refrigerator. The next day Manwaring met McLean at Sutton's house to pay McLean for the car; when he walked in, McLean apologized about the smell of Sutton's body. McLean told Manwaring that his grandmother's body was in the garage in the trunk of the car.

That weekend, McLean went to Jeffrey Gentry's house to sell the refrigerator. McLean did not have the refrigerator and Gentry observed he was rambling about getting rid of the trash, and said, "Snitches need stitches." At some point, McLean told Gentry he had killed his grandmother because she had snitched on him about his drugs, and he had "to take care of it." He also spoke about using his grandmother's credit card and money, and that she was starting to stink. According to Gentry, McLean said he had been talking to his uncle about his grandmother snitching on him, and his uncle said, "Well, you know what you need to do." Gentry threw McLean out of his house.

McLean also met with Julian Calles to temporarily exchange Sutton's gold necklace for methamphetamine. McLean told Calles that his grandmother was "laying down and pissing him off," and that he hated her.

Tori M. later told a detective that McLean was angry at Sutton for snitching on him. She also told police that McLean said he "did all kinds of stuff" to Sutton's body before dumping it.

*The Police Search Sutton's House*

Police searched Sutton's home on the evening of Sunday, July 14, 2013, after Sutton's daughter Andreana Arriaga reported her mother missing. Arriaga and her husband had come to Sutton's home at about 9:30 that night after not hearing from her for several days; when they arrived Arriaga found the back door wide open, the house in disarray and McLean at his computer looking "out of it" with Sutton's car keys next to him, causing Arriaga to be alarmed. When Arriaga asked McLean where Sutton was, he told her he did not know. Arriaga believed McLean was lying because she knew he had told a neighbor Sutton would be back by 9:00 p.m. She ran outside and called police.

Murrieta police sergeant Scott Montez responded with other officers to the missing persons call at Sutton's house. Although Sutton usually kept her house very meticulous, it was messy and smelled strongly of bleach. A garden shovel was in the front lawn and a side fence was broken. Around the house and garage someone had placed and turned on several fans. Sergeant Montez noticed that a piece of carpet between the garage and McLean's room had been cut out. The sergeant found methamphetamine and a methamphetamine pipe in McLean's bedroom. Tire tracks

6

found in the backyard indicated someone had driven a small car into it. The carpet liner had been removed from the trunk of Sutton's car.

An investigating officer observed that McLean appeared unconcerned when told they were investigating his missing grandmother. He initially told the officer that he had not been home but had been with friends for a few days and had not seen her, then he changed his story and said he had seen his grandmother that morning. Sergeant Montez arrested McLean for the drugs. While leaving the scene, McLean told another officer that he had seen Sutton in the morning and washed fertilizer out of the trunk of her car after a bag of fertilizer broke as he was removing it. McLean told that officer he left in Sutton's car at about 10:00 a.m., met friends at a mall, and returned about 7:30 p.m., where he found the rear sliding door open and his grandmother gone. Police found Sutton's credit card in McLean's bedroom, as well as a sheathed machete still in its original store packaging in a large plastic bin. Sutton's security surveillance system had been pried open and the hard drive removed.

A few days later, police were called out again to Sutton's house, where they were directed to a box that had been under McLean's bed containing a ring that Sutton never removed, as well as Sutton's three checkbooks, a receipt, and a checkbook register. Several checks appeared as if someone had been trying to write Sutton's name on them, numerous times in different ways. One of the checks was dated July 11, 2013.

*Prosecution's Trial Evidence Concerning Sutton*

At trial, Arriaga testified she had a good relationship with Sutton, and described her as a caring, giving and loving mother and grandmother who was very happy at that

7

time in her life.  Though Arriaga admitted Sutton had a temper and would yell when she was angry, she testified Sutton was not a violent person and Arriaga had never seen her injure or hit anyone.  Arriaga testified that she had no reason to believe her mother would ever be physically violent with anyone unless she was being attacked herself.  She agreed, however, that her mother was a paranoid person; Sutton thought someone was stalking her, was concerned for her safety, and had installed a security alarm and dummy cameras in her house to deter roommates from interfering with her possessions.  On cross-examination, Sergeant Montez testified that based on his prior contacts with Sutton, he felt she was "a little paranoid."

*Defense Evidence*

Catherine McLean[2] testified that her mother was very loving, but had a lot of mental health issues and engaged in verbal and physical abuse.  Sutton directed foul language at her and McLean, and as she got older her personality switched "all the time" from kind and calm to verbally abusive.  According to Catherine, they could not predict Sutton's changing behavior and there was nothing they could do to stop it.  Sutton could "flip on and off" within five minutes or for days.  Catherine testified that she saw Sutton get physically aggressive with McLean, who was "all whacked out on drugs," and Catherine had to tell Sutton she could not do that.  Sutton also engaged in physical abuse with Catherine, as well as the kids and grandkids, in that she would "jump on you," "pull[] hair," and "throw things at you."

---

[2]     We refer to Sutton's daughter Catherine McLean by her first name to avoid confusion.

McLean testified in his defense at trial. He stated he had been up several nights before July 11, 2013, using heroin, smoking methamphetamine, drinking alcohol and taking Xanax. On the morning of Sutton's death, McLean and his friends were taking Xanax and drinking alcohol, and he was "smoked out" with his mind "gone." After the vandalism incident and his release from police custody, McLean walked the three to five miles back to Sutton's house because nobody came to pick him up. When he entered the house, Sutton was instantly upset and started arguing with him, frustrating McLean, who just wanted to shower and leave to meet his friends. McLean admitted he was acting paranoid and irrationally with the alarm technician. According to McLean, when he got out of the shower, Sutton continued to argue with him while he smoked a cigarette outside, drank a beer, and took out the trash; she told him she wanted to talk and did not want him to leave, causing the frustration to build between them. Sutton also admonished McLean to "get your ass in the backyard" if he were going to smoke cigarettes. McLean returned to his room where Sutton continued to argue with him until his phone rang. When he finished his call, Sutton returned and asked who he was talking to, and told him she needed his help on some things first before she would let him use her car.

McLean testified that he did not intend to help Sutton and started getting his things together. After trying to make another call, he went outside to smoke another cigarette, which made Sutton upset again, so he put it out and got his things. Sutton told him she was not going to let him borrow her car, calling him a loser and a drug addict, and he told her he was leaving. According to McLean, Sutton was following him and yelling at his

9

back, then she grabbed his arm, scratching him. McLean told Sutton to "back the fuck off" of him and threatened that he could get her in trouble for scratching him, but Sutton responded that she would just call the police and tell them he hit her, and they would believe her because she was an old woman. McLean testified that he got "pissed" and she got "physical" with him again. They were yelling at each other and started getting into a fight: "She's scratching me and [I'm] pushing her—pushing her off of me. She falls down. I trip over her and fall down to her. . . . [¶] . . . We get in a fight. Tussle. Whatever."

McLean testified that he then "snapped" because he "had enough of her shit." "And once I fell on the floor, like when she scratched me again and caused those big [scratches], I pushed her down. When I pushed her, I pushed myself too hard, and I fell on top of her, and I fell down on the ground with her and just—I don't know. Snapped." When asked how he thought Sutton died, McLean testified: "She died because when I fell to the floor, we started, like, kind of getting into like a wrestling thing, and I—and I choked her. That's when I blacked out." McLean described himself as having an "out-of-body experience." When he came back to consciousness he got up, fixed himself and walked away, but after a few moments he called over to Sutton and asked whether she was alright. McLean described himself as in shock and disbelief, and panicked. When it dawned on him that he could not leave Sutton outside, he put her in the trunk of her car and met his friends at the gas station. McLean denied that Sutton had a belt around her neck or that he punched her body.

According to McLean, he lied to Erickson when he said he killed Sutton because she snitched on them about the vandalism because he was scared and trying to act "tough." It was Erickson's idea to get supplies to dispose of Sutton's body and to clean the house of fingerprints and McLean's blood. McLean admitted to saying, "Snitches get stitches," and, "You snitch, you die," but claimed he did so only to act like a "tough guy." Several days later, McLean bought a large tub into which he placed Sutton, drove to somewhere in the remote mountains in Yucaipa, and dropped the locked tub down a mountain cliff.

McLean testified that as a child, he had been told that Sutton was bipolar, schizophrenic, and "just crazy." According to him, Sutton could be a nice grandmother and then minutes later be very aggressive, argumentative and hostile. He testified fights with her "never stop[ped]"; that they could have resting points but would pick back up, and could be verbal to physical. Her verbal confrontations could be explosive and always included profanity. McLean saw physical fights between his mother and aunt and Sutton when he was younger, and as he described it, Sutton would either argue or "just flat out haul out and just start smacking you up." McLean stated that as Sutton aged, she was more verbal in her fights. He referred to Sutton's tendencies as "outbreak[s]" or a "burst of fury." McLean's lifestyle and his comings and goings caused confrontations with Sutton involving screaming and arguing; the confrontations were "out of proportion" and not logical or rational. There were repeated "giant" fights involving yelling and swearing.

11

McLean denied being angry with or blaming Sutton in connection with his arrests on either June 24 or July 11. He testified he had no reason to hate her and did not want to do away with her. He testified that Sutton was disappointed in him and embarrassed about having police show up at her house.

*Jury Instructions*

The trial court instructed the jury on the lesser included offense of voluntary manslaughter based on the theories of sudden quarrel or heat of passion on involuntary manslaughter, and the effects of voluntary intoxication on a homicide. McLean's counsel did not request, and the court did not give, an instruction on voluntary manslaughter based on imperfect self-defense.

DISCUSSION

I. *Legal Principles Relating to Unreasonable Self-Defense and Standard of Review*

"Unreasonable self-defense is 'not a true defense; rather, it is a shorthand description of one form of voluntary manslaughter.' " (*People v. Elmore* (2014) 59 Cal.4th 121, 134; *People v. Barton* (1995) 12 Cal.4th 186, 200.) " ' "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 581; see also *People v. Duff* (2014) 58 Cal.4th 527, 561.) Though so-called "perfect" self-defense requires an actual *and* reasonable belief in imminent danger of death or great bodily injury, imperfect self-

12

defense requires only an actual but unreasonable belief in the same imminent danger of death or great bodily injury. (*People v. Iraheta* (2014) 227 Cal.App.4th 611, 620.) " 'The doctrine [of imperfect self-defense] is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. . . . " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with.*' " ' " (*Manriquez*, 37 Cal.4th at p. 581; see also *People v. Butler* (2009) 46 Cal.4th 847, 868.)

Because voluntary manslaughter is a lesser included offense of murder (*People v. Duff*, *supra*, 58 Cal.4th at p. 561), the court must instruct sua sponte on the lesser offense "whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense." (*Ibid.*; *People v. Moye* (2009) 47 Cal.4th 537, 556; *People v. Cook* (2006) 39 Cal.4th 566, 596 [court must instruct on lesser offense when "there is substantial evidence that defendant committed the lesser included offense, which, if accepted by the trier of fact, would exculpate [him] from guilt of the greater offense"]; *People v. Manriquez*, *supra*, 37 Cal.4th at p. 584.) In particular, "[t]he court's duty to instruct on voluntary manslaughter under an imperfect self-defense theory arises ' "whenever the evidence is such that a jury could reasonably conclude that the defendant killed the victim in the unreasonable but good faith belief in having to act in self-defense." ' [Citation.] 'In a murder case, trial courts are obligated to instruct the jury on defenses supported by substantial evidence that could lead to

13

conviction of the lesser included offense of voluntary manslaughter, even where the defendant objects, or is not, as a matter of trial strategy, relying on such a defense.' [Citation.] Substantial evidence is not ' " '*any* evidence, no matter how weak,' " ' but evidence from which a reasonable jury could conclude that the defendant was guilty only of manslaughter." (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1227-1228.)

In deciding whether there is substantial evidence of a lesser included offense, we do not evaluate the credibility of the witnesses, a task for the trier of fact. (*Manriquez*, *supra*, 37 Cal.4th at p. 585.) If the evidence in support of the lesser offense is " 'minimal and insubstantial,' " the court need not give the instruction. (*People v. Barton*, *supra*, 12 Cal.4th at p. 201.) We independently review the question of whether the trial court erred by failing to instruct on a lesser included offense, considering the evidence in the light most favorable to McLean. (*Manriquez*, at p. 587; *People v. Brothers* (2015) 236 Cal.App.4th 24, 30.)

## II. *Contentions*

McLean contends there was ample evidence to require an instruction on imperfect self-defense, including his testimony that "Sutton attacked him and he killed her while fighting back."[3] He maintains his testimony was consistent with that of others that Sutton suffered from mental health issues, causing her to be paranoid, aggressive and

---

[3] McLean also contends at this point in his brief that the evidence warranted instruction on perfect self-defense as well. A self-defense instruction would have advised the jury in part that McLean may have been entitled to defend himself against Sutton, but could not use force beyond that which would appear reasonably necessary to prevent imminent injury. (CALCRIM No. 505.) McLean did not develop any such argument elsewhere in his brief, and we do not address it.

14

violent. According to McLean, the court's error denied him his constitutional right to have the jury determine every material issue presented by the evidence, and must be reviewed under the federal *Chapman v. California* (1967) 386 U.S. 18 standard of harmless error, requiring reversal unless the court can determine that the jury's verdict was surely unattributable to the erroneous instruction. He further argues that this court should find prejudice under the state *People v. Watson* (1956) 46 Cal.2d 818, 836 standard of harmless error, and conclude there is a reasonable chance he would have achieved a better result but for the error, because he gave the only testimony as to the precise circumstances of Sutton's death and there was nothing to contradict his version of events.

The People respond that the evidence that McLean was guilty *only* of voluntary manslaughter based on imperfect self-defense was not substantial enough to merit consideration by the jury. They point out the evidence does not show McLean strangled Sutton out of an actual belief that she threatened to kill him or cause him great bodily harm; that there is no evidence of any threat let alone an imminent threat and McLean's claim amounts to unsupported speculation.

### III. *Analysis*

Our analysis is straightforward. Accepting the evidence in McLean's favor and reviewing it independently, we conclude the trial court correctly did not instruct the jury on imperfect self-defense. We look for evidence from which a reasonable jury could

15

conclude McLean *only* committed voluntary manslaughter by killing Sutton out of an actual but unreasonable belief he was in imminent danger of death or serious bodily injury. McLean's version of events—that he engaged in a heated argument with 71-year-old Sutton, who followed him, then came at him and grabbed his arm, scratching him—is not evidence from which jurors could have concluded McLean acted with an actual, albeit unreasonable, belief that he was in *any* danger of death or great bodily injury. McLean did not testify or suggest he believed he was imperiled to such an extent by Sutton's actions. Indeed, he told her to back off and threatened to call the police. And after Sutton came at McLean again and scratched him, McLean "snapped" because he "had enough of her shit," and pushed Sutton down, falling on top of her, where they wrestled and he choked her. His own testimony suggests he acted not out of fear of imminent serious harm or death, but because his patience was exhausted by her actions.

Evidence that Sutton was bipolar or paranoid, and at times resorted to cursing and yelling or even physical abuse by pulling hair, throwing things or "jump[ing]" on family members, would not persuade a reasonable jury to infer that McLean actually or honestly believed he was in any imminent serious danger. (*People v. Valdez* (2004) 32 Cal.4th 73, 116 [substantial evidence is evidence that a reasonable jury could find persuasive].) Such behavior, while incendiary and aggressive, does not suggest any tendency to resort to deadly force or conduct that would cause significant or substantial injuries. (See *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066 ["Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate"].) Sutton's actions in getting "physical," coming from an unarmed 71-year-old woman against then

16

21-year-old McLean, do not rise to the level of conduct that could cause McLean to perceive imminent danger of death or great bodily injury.

In short, the record is devoid of evidence suggesting that McLean strangled Sutton out of a belief that he was himself in imminent danger of being killed or seriously injured by her, which would preclude a finding of malice. At the same time, as we have set out in detail above, the record contains abundant direct and circumstantial evidence that McLean decided to kill Sutton because he believed she had reported him to police. The circumstances of his arrests, his ensuing anger toward Sutton, his use of a belt to strangle her, and his actions after her death in bragging about the killing, as well as his efforts to conceal and dispose of her body, all point to a deliberate and premeditated killing. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1080-1082; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 10 [the process of premeditation and deliberation does not require any extended period of time; it is the extent of the reflection not the length of time, and strangulation as a manner of killing is sufficient evidence of premeditation and deliberation because its prolonged nature provides ample time for the killer to consider his actions], quoting *People v. Hovarter* (2008) 44 Cal.4th 983, 1020 ["This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act"]; *People v. Davis* (1995) 10 Cal.4th 463, 510 [manner of killing alone by strangulation supported conviction for first degree premeditated murder].) The trial court did not err by declining to instruct the jury on the theory of imperfect self-defense.

17

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


HUFFMAN, Acting P. J.


NARES, J.