Filed 8/4/23  P. v. Alvarado CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E078497 |
| v. | (Super.Ct.No. RIF1900801) |
| JUAN CARLOS LOPEZ ALVARADO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Bernard J. Schwartz, Judge.  Affirmed.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, and Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

After defendant Juan Carlos Lopez Alvarado found out his wife was cheating on him, he said he was going to kill her.  They reconciled.  About a month later, however, his wife told him, "It's going to keep happening."  She was never seen alive again.

At first, defendant told relatives that his wife had left him for another man.  He sent (or had his accomplice send) text messages from her phone, purporting to be from her, saying she had run off with another man.  However, he then claimed he had been contacted by kidnappers who were holding her for ransom.

A week after his wife disappeared, defendant bought a sleeping bag, crossed over the border to Mexicali, then crossed back.  He told relatives that the kidnappers had said they would release his wife in Mexicali.  His wife's body was found in an alley in Mexicali, in the sleeping bag that defendant had bought.  She had been strangled some 24 to 72 hours earlier with a charging cord, which was still around her neck.

In a jury trial, defendant was found guilty of first degree murder.  (Pen. Code, §§ 187, subd. (a), 189, subd. (a)).  He was sentenced to 25 years to life in prison.

Defendant appeals, contending:

(1)  There was insufficient evidence of premeditation and deliberation to support the conviction for first degree murder.

(2)  The trial court erred by failing to instruct on voluntary manslaughter on a heat of passion theory.  Alternatively, defendant's trial counsel rendered ineffective assistance by agreeing to omit such an instruction.

We will hold that there was sufficient evidence of deliberation and premeditation. Defendant had a motive to kill his wife; he and his accomplice kept her imprisoned and incommunicado for at least four days before killing her; he changed his story from a break-up to a kidnapping, so as to account for her subsequently being found dead; and he used a method of killing that took some three to five minutes of constant pressure.

We will also hold that there was insufficient evidence of provocation to require an instruction on "heat of passion" voluntary manslaughter. The four to six days between defendant's wife's disappearance and her death were more than enough "cooling time," as a matter of law, and there was no evidence of any new provocation.

I

STATEMENT OF FACTS

Defendant lived in Jurupa Valley with his wife Jane Doe R.L. (Jane),[1] their three children, and their daughter-in-law.

Defendant was very close to his brother-in-law (the husband of his sister), Cornelio Corrales Robles;[2] they were best friends. Cornelio lived on 54th Street in Mira Loma. Defendant owned a piece of property six blocks away from Cornelio, also on 54th Street; he was often seen there with Cornelio.

---

[1]     The trial court ordered that the victim be referred to by this fictitious name. (Pen. Code, § 293.5.)

[2]     Cornelio had pleaded guilty to being an accessory after the fact to murder (Pen. Code, § 32) and been given immunity for his testimony.

3

Jane was having an affair with Agustin Q. (Agustin). Defendant's 16-year-old daughter came to suspect that Jane was seeing another man. She told Ilce, defendant's daughter-in-law. Together, they told defendant, but he did not believe it.

On December 24, 2018, the daughter used the "Find My iPhone" app to find the location of Jane's iWatch. It showed that Jane was in Chino. Defendant went there. He found Jane and Agustin sitting in her car, outside Agustin's sister's home. He pulled Agustin out of the car by the shirt and threatened to hit him. When Jane got out of the car, he "raised his hand at her" and said he was going to kill both of them. Agustin had his brother-in-law call the police. Meanwhile, defendant left.

That Christmas was tense, but by New Year's Day, defendant and Jane appeared to have reconciled.

On January 26, 2019, Jane told her mother she had something very important to tell her whole family; she seemed nervous. Ilce heard defendant and Jane arguing and Jane crying.

On January 27, Jane asked Agustin to talk to her in person right away. They met up at a park. Jane was scared and crying; she sounded "[b]roken."

On January 28, in the morning, Agustin talked to Jane on the phone. She sounded "[g]ood." At 10:23 a.m., Jane sent her mother a video.

Around 11:00 a.m. or 12:00 noon, as Ilce was on her way to the bathroom, she saw Jane and defendant in the hallway. The bedroom door was open. Jane said, "No. It's

4

going to keep happening."[3]  As Ilce entered the bathroom, she heard a sound like the bedroom door slamming.[4]  When she exited the bathroom, the bedroom door was closed. She heard the shower running.

Some 15 to 20 minutes later, Ilce asked defendant to tell Jane she was leaving.  He said Jane was in the shower, but he would tell her.

Around 2:30 p.m., when defendant picked the daughter up from school, he told her that Jane had left the family.

When Ilce got home, between 6:00 and 8:00 p.m., neither Jane nor defendant was there.  As Jane worked nights, her absence was not unusual.

When defendant came home, between 7:00 and 10:00 p.m., he told Ilce that Jane had left home.  He said Jane "was taking such a long shower, he went in to check on her but she was gone[.]"  "[T]he water was still running but she was not there[.]"

Jane's car and clothing were still at the house.  Only her wallet, iWatch, and cell phone were missing.[5]

Jane did not respond to phone calls and text messages.  Agustin expected to hear from her again later that day, but he did not.

---

[3]    Ilce did not recall anything defendant said in response.  When asked if she told the police that he said "No, [Jane].  No, [Jane]," she did not recall.

[4]    However, she also described it as "a sound that [she] had not heard before."

[5]    Witnesses differed as to whether Jane's purse was missing.

On January 29 and 30, defendant told Jane's relatives and one of Jane's friends that Jane had left him for another man and had taken either "a lot of money" or specifically $20,000.

Defendant's house was equipped with security cameras both inside and outside. Family members urged him to check the video. At first he got upset and said no, because it might show something "intimate"; then he agreed, but the cables to the cameras had been cut.

Between January 28 and 31, Jane's relatives got text messages from Jane's number. Her mother got texts saying Jane had made a mistake, defendant found her talking to someone else, and she took some money and "got out." Her friend got a text saying "I'm fine, don't worry . . . ." The daughter, while in defendant's presence, got a text telling her to "take care of [your] dad and [your] sister."

However, these texts were not in Jane's usual style. Some had uncharacteristic misspellings. Some had no spaces between the words. Others had periods after every word. When defendant sent a text message, he typically ran all the words together, with no spaces between them; he did not spell well.

On February 1, defendant showed up at Agustin's home. He was angry. He said Jane had left and he was looking for her. He wanted to know Agustin's cell phone number. Then he calmed down and said Jane had been kidnapped. Agustin asked if he had called the police; defendant said he was planning to.

Starting on February 1, defendant similarly told Jane's relatives that Jane had been kidnapped. He said the kidnappers had called him from a private number, claimed to have Jane in Tijuana, and demanded a ransom of 5 million pesos. For Jane's safety, he was not going to call the police. On February 2, while in the presence of relatives, he got a phone call that he said was from the kidnappers.

On February 3, as shown by store records, security video, and cell phone records, defendant and Cornelio went to a Bass Pro Shop in Rancho Cucamonga and bought a blue Ascend sleeping bag. According to Cornelio, they then drove to Cornelio's house.

Also on February 3, defendant bought a third cell phone, using the false name Pablo Lopez. He told Ilce and the daughter that he was going to San Diego the next day; at his request, Ilce agreed to drive his daughters to school that morning.

As shown by security video and cell phone records, on February 4, around 9:05 a.m., defendant and another man crossed the border into Mexicali in Jane's car. Around 11:50 a.m., defendant crossed back into California, alone. At the border, he gave the false name Miguel Mejia.

That same day, defendant told one of Jane's relatives that the kidnappers were going to release Jane in the Pueblo Nuevo neighborhood of Mexicali. The relative notified the police. Around 1:00 p.m., Jane's body was found, in a blue Ascend sleeping bag, in the middle of an alley in Pueblo Nuevo. This location was four or five blocks from the border. A tag on the sleeping bag indicated that it had been purchased at the Bass Pro Shop in Rancho Cucamonga.

In the opinion of the medical examiner who performed the autopsy, Jane had been dead for 24 to 72 hours.[6] The cause of death was ligature strangulation. An Apple charging cord, with a knot in it, was still around Jane's neck. Defendant's DNA was on the cord. Strangulation would have required constant pressure for three to five minutes.

Jane had been struck in the forehead and both eyes before she died. There were no signs that she had been bound.

Defendant's DNA was found in Jane's vagina and anus, along with a low level of the DNA of another male (not Cornelio). DNA from sperm could remain in the vagina for "five days or more."

About two weeks after Jane disappeared, the daughter found Jane's iWatch in a gym bag. She had searched the bag before, when Jane disappeared, and the iWatch had not been there then. Defendant told her she could erase the watch and keep it, which she did.

At his earliest opportunity, defendant started keeping Jane's car at his property on 54th Street. On February 15, 2019, using the false name Pedro Gomez, he bought a new trunk mat and installed it in Jane's car.

On February 18, defendant and Cornelio were arrested while defendant was driving Jane's car away from Cornelio's home on 54th Street. The police seized three cell phones from defendant. His main phone had no data earlier than February 11. His

---

[6]    This was counting back from 8:00 or 9:00 p.m. on February 4, when the body was refrigerated. Thus, it meant that Jane was still alive at least until 8:00 p.m. February 1, and possibly until 9:00 p.m. on February 3.

8

second phone had no data earlier than February 16. The new phone he had purchased on February 3 had no data from either February 3 or 4.

Cell phone records showed that on January 28, at 12:52 p.m., Jane's cell phone was near her home. At 3:06 p.m., it was near Cornelio's home. From January 29 to 31, it was near Cornelio's home (as well as in Norco and Pedley), but it had no activity near Jane's home. There was no activity on Jane's phone after January 31.

Meanwhile, every day from January 28 through February 4, defendant's main phone was near his house at some times and near Cornelio's house at other times (plus Rancho Cucamonga on February 3 and the Mexican border on February 4, as well as other locations).

When interviewed, defendant denied killing Jane. He also denied going to Bass Pro Shop or buying a sleeping bag, until he was shown photos of himself doing so. He claimed he gave the sleeping bag to one of Jane's relatives.

I

THE SUFFICIENCY OF THE EVIDENCE

OF PREMEDITATION AND DELIBERATION

Defendant contends that there was insufficient evidence of premeditation and deliberation to support the conviction for first degree murder.

"When considering such a challenge, '"we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a

9

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" [Citation.] We consider "'whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" [Citation.] '[A] reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.)

Murder that is "willful, deliberate, and premeditated" is of the first degree. (Pen. Code, § 189, subd. (a).)

"'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .'"' [Citation.]" (*People v. Cage* (2015) 62 Cal.4th 256, 275–276.)

"In *People v. Anderson* [(1968) 70 Cal.2d 15] (*Anderson*), [the Supreme Court] identified 'three basic categories' of evidence [it] has generally found sufficient to sustain a finding of premeditation and deliberation: (1) planning activity, or 'facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing';

(2) motive, or 'facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a "motive" to kill the victim'; and (3) manner of killing, or 'facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a "preconceived design" to take his victim's life in a particular way for a "reason" . . . .' [Citation.]" (*People v. Morales* (2020) 10 Cal.5th 76, 88–89.)

"In the years since *Anderson*, '"[the Supreme Court] ha[s] emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight."' [Citation.]" (*People v. Morales*, *supra*, 10 Cal.5th at p. 89.) However, we need not decide whether evidence of all three *Anderson* factors is required, because we conclude that there was such evidence here.

Defendant's primary argument is that there was no evidence of planning activity. Also, while he concedes that "there was evidence of motive to kill," he argues that in this case, his motive tended to show a killing on impulse rather then after careful thought, consideration, and reflection. (See *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1268 [*Anderson* motive factor requires a motive that shows "'the killing was the result of a "pre-existing reflection" and "careful thought and weighing of considerations" *rather than* "mere unconsidered or rash impulse."'"].)

Defendant's argument hinges on the presumption that he killed Jane on January 28, when Ilce heard what she thought was a door slamming. This ignores the evidence

11

that (1) at 3:06 p.m., Jane's phone was near Cornelio's house on 54th Street, and (2) Jane was still alive until some time between 8:00 p.m. on February 1 and 9:00 p.m. on February 3. The obvious inference is that defendant kept Jane locked up at Cornelio's house for some four to six days before he killed her.

At oral argument, defendant noted the medical examiner's testimony that there are "variables" that can affect the determination of the time of death — "mainly" weather. However, "This is why we use ranges, minimum and maximum." In this case, the maximum was 72 hours. Tight-fitting clothing could also affect this determination, but it would leave marks, which were not present. In closing argument, defense counsel argued that the medical examiner was "totally believable, totally credible" and hence Jane "could not have been killed prior to Friday," February 1. "[W]e know January 28th, which is Monday, she's still alive. Tuesday, January 29th, she is still alive. Wednesday, January 30th, and so forth, she's still alive."

The very fact that defendant imprisoned Jane suggests a plan to kill her. Otherwise, what was his end game? What did he expect to happen if he released her? He had already told the whole family that Jane had left him. If released, she would hardly back up that story. Rather, she would go to the police — perhaps not immediately, if he threatened her effectively enough, but eventually.

Moreover, even assuming defendant did not initially plan to kill Jane, he had at least four days to think about what to do with her. By the end of this time, he had decided to kill her. It is significant that, on February 1, he changed his story. His first

12

story had been that Jane had left him. If he killed her, however, it would be hard to explain why she had disappeared so completely — not taking her clothing or her car, not contacting Agustin, not even contacting the children. Thus, he came up with his second story, that Jane had been kidnapped. That way, when he killed Jane, he could blame the kidnappers. Presumably, then, on or before February 1, defendant made a premeditated and deliberate decision to kill.

At oral argument, defendant asserted that defendant may already have killed Jane before he started telling the kidnapping story. However he told this story to at least four separate people on February 1. It is inferable that this was before Jane was killed, sometime between 8:00 p.m. on February 1 and 9:00 p.m. on February 3.

This was ample evidence of planning activity. It was also ample evidence of motive. To the extent that defendant's motive was ambiguous — some husbands may react to being cuckolded with an explosion of violence, others with a cold plan for revenge — the circumstances here show that defendant was the latter type.

Last but not least, there was ample evidence of a manner of killing that showed premeditation. "[T]he California Supreme Court has held that strangulation as a manner of killing is sufficient evidence of premeditation and deliberation because its prolonged nature provides ample time for the killer to consider his actions. [Citation.]" (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 11, fn. omitted, citing *People v. Hovarter* (2008) 44 Cal.4th 983, 1020 ["'This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the

offender to consider the nature of his deadly act.'"] (*Hovarter*); accord, *People v. Quintanilla* (2020) 45 Cal.App.5th 1039, 1064 ["killing a victim by strangulation shows the type of premeditation and deliberation necessary to support a conviction for first degree murder."].)  It would have taken three to five minutes of constant pressure to cause death.  The fact that the cable was knotted was additional evidence of premeditation.  (See *People v. Bonillas* (1989) 48 Cal.3d 757, 792.)

Defendant relies on *People v. Rowland* (1982) 134 Cal.App.3d 1 (*Rowland*), which held that, when evidence of planning is "minimal" and there is no evidence of motive, ligature strangulation alone is insufficient to prove premeditation and deliberation.  (*Id*. at pp. 8–9.)  However, *Rowland* was decided without the benefit of the Supreme Court's decision in *Hovarter*.  In any event, *Rowland* is distinguishable, in two respects.  First, as discussed, here there was evidence of both planning and motive.  Second, it does not appear that in *Rowland*, there was any expert testimony on how long ligature strangulation had to continue to cause death.  (See *People v. Shamblin*, *supra*, 236 Cal.App.4th at p. 12 [similarly distinguishing *Rowland*].)

We therefore conclude that there was sufficient evidence of premeditation and deliberation.

III

THE NEED FOR A VOLUNTARY MANSLAUGHTER INTSTRUCTION

Defendant contends the trial court erred by failing to instruct on voluntary manslaughter on a heat of passion theory. He also contends his trial counsel rendered ineffective assistance by agreeing that such an instruction was unnecessary.

During an instructions conference, the trial court remarked, "There were no lessers that were requested . . . . I don't think there's any basis for any lessers. Do you agree?" Defense counsel responded, "I agree."

""""[I]t is the 'court's duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged *and shown by the evidence to have been committed*.' [Citation.]" [Citations.]' [Citation.] 'Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense.' [Citation.] '"[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.] Rather, substantial evidence must exist to allow a reasonable jury to find that the defendant is guilty of a lesser but not the greater offense. [Citation.] """"Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive."""" [Citation.]' [Citation.]" (*People v. Westerfield* (2019) 6 Cal.5th 632, 718.)

15

"'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)

"Voluntary manslaughter is a lesser included offense of murder. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.) "When an unlawful killing occurs 'upon a sudden quarrel or heat of passion' [citation] the killer lacks malice, and the crime is voluntary manslaughter . . . . [Citation.]" (*People v. Dungo* (2012) 55 Cal.4th 608, 615, fn. 4.) "'[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation . . . .' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549–550.)

"To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. . . . [P]rovocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)

Preliminarily, the People argue that defense counsel invited the error by agreeing that the trial court did not have to instruct on any lesser included offenses. We disagree. "The obligation to give an instruction on lesser included offenses exists even when a defendant expressly objects to it. [Citation.]" (*People v. Nieves* (2021) 11 Cal.5th 404,

16

463.) "Nevertheless, the claim may be waived under the doctrine of invited error if trial counsel both '"intentionally caused the trial court to err"' and clearly did so for tactical reasons. [Citation.] Invited error will be found, however, only if counsel expresses a deliberate tactical purpose in resisting or acceding to the complained-of instruction. [Citations.]" (*People v. Souza* (2012) 54 Cal.4th 90, 114.)

Here, defense counsel expressed no such deliberate tactical purpose. To the contrary, he simply agreed with the trial court that there was insufficient evidence of voluntary manslaughter.

Moreover, no tactical purpose is apparent. The People argue that a voluntary manslaughter instruction would have conflicted with what defense counsel actually argued, namely that defendant was not the killer. However, that defense was almost laughably weak. A reasonable attorney in defense counsel's position would have been delighted to have some lesser included offense to offer the jury, even if that required arguing in the alternative. At a minimum, we cannot say the record affirmatively demonstrates a deliberate tactical choice.

We turn, then to the merits of the contention.

Being confronted with a spouse's adultery is a classic form of provocation. (*People v. Logan* (1917) 175 Cal. 45, 49; *People v. Thompkins* (1987) 195 Cal.App.3d 244, 249.) Here, defendant first discovered Jane's adultery on Christmas Eve. However, he did not kill her then. To the contrary, for a month, the couple appeared to be reconciled. On January 28, Jane tore the Band-Aid off the wound by telling defendant,

17

"It's going to keep happening." However, he still did not kill her. As discussed, Jane was alive until at least 8:00 p.m. on February 1. This was enough "cooling time," as a matter of law. (*People v. McShane* (2019) 36 Cal.App.5th 245, 256 [four days]; see also *People v. Hach* (2009) 176 Cal.App.4th 1450, 1453–1454, 1458–1459 [six hours, from 6:00 p.m. to midnight].)

Defendant killed Jane sometime between February 1 and 3. There is no evidence of the circumstances of the killing. Thus, it would be speculation to suppose that he killed her in a new heat of passion, in response to new provocation.

In sum, then, there was no substantial evidence that defendant killed while under a heat of passion induced by legally adequate provocation.

IV

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

RAPHAEL
J.

18