Filed 1/29/26  P. v. Coronado CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDUARDO MANUEL CORONADO et al.,<br><br>    Defendants and Appellants. | B336438<br><br>(Los Angeles County Super. Ct. No. KA126218) |

APPEAL from an order of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Gary V. Crooks, under appointment by the Court of Appeal, for Defendant and Appellant Roberto Camarena.

Shay Dinata-Hanson, under appointment by the Court of Appeal, for Defendant and Appellant Eduardo Manuel Coronado.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Amanda V. Lopez, Deputy Attorney General, for Plaintiff and Respondent.

A trial jury found defendants and appellants Eduardo Coronado and Roberto Camarena guilty of murdering Jose Salvidres (Salvidres) and other crimes. We consider (1) whether substantial evidence supports the jury's finding that defendant Coronado, who was convicted as the principal in the murder, did not act in perfect or imperfect self-defense, (2) whether insufficient evidence supports defendant Camarena's murder conviction on an aiding and abetting theory, (3) whether the jury instructions on aiding and abetting and first degree murder were legally defective, and (4) whether, even without an objection below, a remand for resentencing is necessary because the trial court should have imposed a lower sentence in light of defendants' relative youth.

## I. BACKGROUND

### A. The Murder of Salvidres, As Established by the Evidence at Trial

Defendants are both members of the Puente criminal street gang. Defendant Coronado's gang moniker is "Whisper" or "Little Whisper" and defendant Camarena's gang name is "Klepto." The Puente gang's rivals include the El Monte Flores and Varrio Trece gangs.

On May 16, 2021, at 1:45 a.m., defendant Coronado sent a text message saying, "Me Baby YG and Kleps got popped at today."[1] A minute later, he sent another message saying, "I'm a get my runbacks for sho."

---

[1] Testimony at trial established being "popped at" meant being "shot at."

Later the same day, around 11:30 p.m., defendants and a third person pulled their vehicle into an ARCO gas station located in Hacienda Heights, the territory of a rival gang. Defendant Camarena was driving.

Shortly after arriving, defendant Camarena got out of the car and entered the station's AM/PM convenience store. When walking out, defendant Camarena crossed paths with Salvidres, who was approaching the store. Salvidres was a member of Varrio Trece but was no longer active in the gang. Surveillance video footage from inside the AM/PM shows defendant Camarena turns back toward Salvidres as if to say something, Salvidres appears to respond, and Salvidres then walks away from the AM/PM and toward defendant Camarena.

Surveillance video footage from outside the AM/PM depicts defendant Camarena walking back toward the vehicle he was driving, turning back to face the AM/PM, and appearing to yell something while raising both arms outstretched around eye level. (A gang expert who testified at defendants' trial opined defendant Camarena and Salvidres appeared to be throwing gang signs at each other.) When defendant Camarena arrives back at the vehicle, he opens the driver's door, ducks inside the car as if communicating to the car's other occupants, and gestures with his hand. Salvidres walks toward the vehicle (with his apparently empty hands swinging by the sides of his body), but before he gets there, the front passenger side door opens and defendant Coronado gets out (standing in between the open door and the front passenger seat while facing Salvidres).

Salvidres ultimately gets within arms' reach of the vehicle and there appears to be a two-second exchange of words, after which defendant Coronado lifts his arm over the roof of the

3

vehicle, points a handgun at Salvidres and fires. Defendant Camarena does not react after the first gunshot but Salvidres immediately flinches and runs away from the car. Defendant Coronado stops to re-rack the gun after the first shot, fires at Salvidres again, and then re-racks the gun once more. At that point, defendant Camarena gets in the driver's seat of the vehicle, closes the door, and waits for defendant Coronado to fire five more gunshots at Salvidres and re-enter the vehicle before driving off in the direction Salvidres ran.

Hose Diaz (Diaz) was also at the ARCO gas station that night. Prior to the shooting, he heard name-calling, including the words "El Monte" and "Puente" or "Hacienda."[2] He thought the exchange was gang related.

Christina Orellana (Orellana) was also at the gas station that night. She was parked behind defendants' vehicle and ducked down in her car after the first shot was fired. When Orellana sat back up, she noticed there were no more cars. She saw the man who had been shot at walking toward the street. She heard him say, "call an ambulance" before she drove away. The video shows Salvidres walk back across the gas station lot, before apparently collapsing on the sidewalk.

Salvidres died of three gunshot wounds. One bullet entered his back and exited his front, and two struck his leg. Law enforcement officers recovered fired cartridges and one live round that was not fired in the area of the gas station. They also discovered a fired cartridge of the same caliber on the sidewalk in

---

[2] At trial, Diaz testified the words were "El Monte" and "Puente." When asked if he previously testified the words were "El Monte" and "Hacienda," he agreed.

4

the direction defendant Camarena drove the vehicle after leaving the gas station. Officers also discovered a bullet hole in a nearby restaurant sign.

### B. Other Offenses (Not Directly at Issue in This Appeal)

In December 2020, defendant Coronado was involved in a police vehicle and foot pursuit that led to his arrest. Before abandoning the stolen vehicle he was driving, defendant Coronado drove directly at a marked law enforcement vehicle. Once on foot, defendant Coronado threw a firearm to the ground.

In May 2021, Sergeant Tawnia Rojas (Rojas) with the Los Angeles County Sheriff's Office observed a suspicious vehicle and detained defendant Coronado after he got out of the front passenger seat. After defendant Coronado and the vehicle's driver had been detained, a deputy opened the back passenger door and discovered defendant Camarena lying across the back seat of the vehicle. He, too, was detained and the deputies recovered two firearms from the vehicle. Subsequent testing revealed one of the guns fired the bullets at the ARCO shooting.

In June 2021, defendant Camarena fled when approached by law enforcement officers and discarded an unregistered firearm in the backyard of a house. Later that same month, law enforcement officers responded to a stolen vehicle report and pursued a vehicle occupied by defendants. When they stopped and exited, officers saw defendant Coronado with a firearm and defendant Camarena handed a bag to defendant Coronado that was later recovered and contained another firearm.

5

*C.* *Gang Expert Testimony at Trial and the Instructions Given to the Jury*

At trial, the jury considered 11 criminal charges against defendant Coronado: murder (including an allegation that he personally used a firearm in the commission of the murder), assault upon a peace officer, fleeing a police officer while driving recklessly, driving or taking a vehicle without consent, and various charges related to the possession of firearms and ammunition. There were seven charges against defendant Camarena: murder, driving or taking a vehicle without consent, and several firearm and ammunition possession charges. We will summarize the gang expert's testimony at trial and the jury instructions given on murder and aiding and abetting.

*1.* *Gang expert*

Eric Saavedra, a gang detective with the Los Angeles County Sheriff's Office, testified during the prosecution's case. He described how gangs operate and the importance of gaining respect by committing crimes.

Detective Saavedra opined that when a gang member asks where someone is from, they are asking them what neighborhood they are from to see if they are a rival or from the same gang. If the response is that the person is from a rival gang, the usual response is some sort of assault all the way up to shooting and murder. According to the detective, gang members who are no longer active are never really out of the gang, and a retired gang member confronted by a rival would say they are from their former gang. Detective Saavedra further testified gang members driving around with fellow gang members always want to know

6

who is armed so they know who to call on to shoot when necessary.

Detective Saavedra testified defendant Camarena had multiple gang-related tattoos on his body, including a "P" tattooed on the right side of his face. Defendant Coronado also had gang-related tattoos, including a tattoo of the word "Puente" on his face. The detective was also asked a series of hypotheticals tracking certain aspects of the facts of Salvidres's murder. When asked how a murder committed by two gang members at a busy gas station in rival gang territory after announcing their gang name would enhance the reputation of the gang and the individuals, Detective Saavedra said it would show the gang is ruthless and would instill fear in rival gangs. As to the individual gang members, Detective Saavedra said they would attain more status in the gang for being willing to put in work. He further testified that someone who looks like they might be a member of a rival gang in gang territory would be a target for a gang member. The detective further opined that in a situation mirroring the facts of this case, where one gang member engages in a verbal exchange with a person he might believe is a rival gang member, turns to another gang member in his car, and the second gang member shoots at the suspected rival, the two gang members would be acting in concert.

### 2.  *Jury instructions*

The trial court discussed with counsel the instructions to be given to the jury. The court said it would give CALCRIM Nos. 400 and 401 regarding aider and abettor liability and CALCRIM Nos. 520 and 521 regarding murder. The court acknowledged the only theory of murder liability against defendant Camarena was

7

direct aiding and abetting and asked counsel for defendant Camarena whether he had any comments regarding the instructions.  Counsel had none.

The court gave the jury CALCRIM Nos. 400 and 401 as planned.  The former stated:  "A person may be guilty of a crime in two ways.  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator, who directly committed the crime.  [¶] A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator."  The latter stated:  "To prove that defendant . . . Camarena is guilty of murder based on aiding and abetting that crime, the People must prove that:  [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.  [¶]  Someone *aids and abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime."

CALCRIM No. 520, informed the jury that to prove a defendant was guilty of murder with malice aforethought, the People were required to prove that (1) "[t]he defendant committed an act that caused the death of another person;" and (2) "[w]hen the defendant acted, he had a state of mind called malice aforethought."  The instruction explained there were two kinds of malice aforethought, express malice and implied malice.  And it explained that "[t]he defendant had *express malice* if he

8

unlawfully intended to kill."  CALCRIM No. 521, in relevant part, provided:  "A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation.  The defendant acted *willfully* if he intended to kill.  The defendant acted *deliberately* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill.  The defendant acted with *premeditation* if he decided to kill before completing the act that caused death."

### D.     Verdicts and Sentencing

The jury found defendants guilty as charged.  As to the murder charges against defendants, the jury found true the allegation that the crime was willful, deliberate, and premeditated murder in the first degree, and the jury found true the allegation that defendant Coronado personally used a handgun in the commission of the murder.

At sentencing, defendant Coronado argued there were mitigating factors in his favor.  The trial court said it had "taken . . . into consideration . . . defendant being a youthful offender" because he was essentially 20 years old at the time of the murder.  The court then said the following, without objection: "I do intend on taking that into consideration, and I will not impose high term sentencing on any of these counts.  I believe mid term is presumptive.  The court could consider low-term sentencing on the determinate sentencing matters.  I feel that other than youthful offender, there is absolutely no mitigation on behalf of [defendant] Coronado that the court could utilize to impose low-term sentencing; so will be mid term as to any and all counts that the court can impose concurrently."  The court

sentenced defendant Coronado to 25 years to life for the murder of Salvidres, with an additional term of four years for the personal use of a firearm, for a total indeterminate term of 29 years to life. The aggregate determinate sentence on the remaining counts of conviction was seven years and four months in prison.

As for defendant Camarena, the trial court found true a prior felony conviction allegation. Counsel for defendant Camarena made an oral motion asking the court to strike his prior conviction based on his age at the time and the length of time since the prior conviction. The court denied the motion, stating his only redeeming quality was his youthful offender status. It then sentenced defendant Camarena to an indeterminate term of 25 years to life for the first degree murder conviction, which was doubled due to the prior strike crime, for a total term of 50 years to life. The aggregate determinate sentence on the remaining counts of conviction was eight years in prison.

## II. DISCUSSION

None of defendants' arguments for reversal is convincing. Substantial evidence, primarily the video footage of the murder, supports the jury's finding that the fatal shooting of Salvidres was murder, not perfect or imperfect self-defense or defense of another. There is also substantial evidence defendant Camarena aided and abetted the murder of Salvidres and did so with premeditation and deliberation—including the evidence that allowed the jury to find defendant Camarena directed defendant Coronado to shoot Salvidres (which he did just five seconds after getting out of the car) amidst the ongoing gang challenges

between defendant Camarena and Salvidres.  There was no error in the instructions given to the jury on aiding and abetting or murder; the instructions sufficiently conveyed the jury must find defendant Camarena harbored malice and premeditated the killing.  Finally, defendants' argument that the trial court erred by not imposing the low term on their sentences due to their youth is forfeited because there was no contemporaneous objection.

> ### A.     *Substantial Evidence Supports the Jury's Finding that Defendant Coronado Did Not Act in Perfect or Imperfect Self-Defense*

To prove defendant Coronado committed murder, the People were obligated to prove beyond a reasonable doubt that he did not act in self-defense.  (*People v. Rios* (2000) 23 Cal.4th 450, 454; *People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.)  By finding him guilty of first degree murder, the jury necessarily found the prosecution had carried this burden.  Substantial evidence supports that finding.

"The doctrine of self-defense embraces two types: perfect and imperfect."  (*Rodarte*, *supra*, 223 Cal.App.4th at 1168.)  For a killing to be justified as perfect self-defense or defense of another, the defendant must actually and reasonably believe he, she, or someone else is in imminent danger of death or great bodily harm.  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  The defendant must also reasonably believe the immediate use of deadly force is necessary to defend against the danger and must use no more force than reasonably necessary.  (*People v. Clark* (1982) 130 Cal.App.3d 371, 380, disapproved on another ground by *People v. Blakeley* (2000) 23 Cal.4th 82, 92.)  Imperfect self-

11

defense or imperfect defense of another applies when the defendant subjectively believes (1) he, she, or another is facing imminent death or great bodily injury, and (2) the immediate use of deadly force is necessary, but one or both of these beliefs is objectively unreasonable. (*Humphrey*, *supra*, at 1082.)

There is substantial evidence defendant Coronado did not act in perfect self-defense or defense of another. The video of the shooting shows Salvidres's hands were visibly empty as he approached defendants' vehicle and he made no furtive movements. Salvidres also did not attack defendant Camarena when he came within an arms' length of him. The circumstances show there was no need to use force at all because defendants could have reentered their vehicle and driven away at any time. Moreover, when defendant Coronado pulled out his gun and pointed it at Salvidres, Salvidres quickly began to back away and, after the first shot and the gun jamming, the jury could infer Salvidres continued to run (one of the bullets struck him in the back) while defendant Coronado fired six additional times. That continued shooting in the absence of any appreciable danger at all is inconsistent with the need to defend and, obviously, well out of proportion to any presented threat. The jury could appropriately find that the shooting was exactly what it appeared to be: a malicious, gang-related murder.

The counterarguments defendants offer are all unpersuasive. They maintain the gang challenges between Salvidres and defendant Camarena are evidence that defendant Coronado reasonably believed he was at risk of suffering imminent death or great bodily injury. The gang expert did testify at trial that gang confrontations generally do lead to violence, but the particular circumstances shown by the evidence

12

in this case allowed the jury to find a killing in self-defense was disproven. Salvidres was unarmed and in a gang dispute with at least two (maybe three, given the other occupant of the vehicle who never got out) gang members—one of whom was armed and all of whom had some protection and a ready means of escape provided by their vehicle.[3]

For essentially the same evidentiary reasons, substantial evidence supports the jury's determination that imperfect self-defense was disproven too. The defense presented no testimony at trial to establish defendant Coronado (or defendant Camarena) feared Salvidres posed an imminent threat of death or causing grave bodily injury and all the video evidence was to the contrary. Salvidres exhibited no weapon, Salvidres made no initial move to attack defendant Camarena, Salvidres retreated and ran once he saw defendant Coronado's firearm, and defendants exhibited no observable fearful behavior throughout the entire episode—indeed, their demeanor is well described as defiant.

---

[3]     Defendant Coronado also appears to assert, in passing, that the prosecution's closing argument confused the jury as to the burden of proof for self-defense. The point is inadequately presented for decision. (Cal. Rules of Court, rule 8.204(a)(1)(B); see also, e.g., *People v. Flores* (2024) 101 Cal.App.5th 438, 451, fn. 3.) We note, however, that the jury was properly instructed on principles of self-defense and instructed that the arguments of counsel are not evidence. (See generally *People v. Cortes* (2022) 75 Cal.App.5th 198, 205.)

*B.    Substantial Evidence Supports Defendant
        Camarena's First Degree Murder Conviction*

Defendant Camarena contends there was insufficient evidence at trial to prove he aided and abetted Salvidres's murder, and even if there were adequate evidence of that, there is still insufficient evidence to prove it was a premeditated, willful, and deliberate murder of the first degree.  We discuss, in that order, the reasons why these arguments are unpersuasive.

*1.    Aiding and abetting*

"For a defendant to be liable as a direct aider and abettor, 'the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission.'"  (*In re Lopez* (2023) 14 Cal.5th 562, 579.)  Aiding and abetting may be shown by circumstantial evidence.  "'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.'"  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054.)  Motive is also relevant.  (*People v. Smith* (2005) 37 Cal.4th 733, 741 ["evidence of motive is often probative of intent to kill"].)

Substantial evidence supports a finding that defendant Camarena acted as an aider and abettor with the intent to kill Salvidres.  Defendants are members of the Puente gang, which had a rivalry with a gang in Hacienda Heights.  According to the text message evidence, defendants were shot at earlier the same day and they drove into Hacienda Heights territory, which the jury could readily infer meant they were looking to exact similar

14

revenge (in the parlance of the texts, to get "runbacks for sho" after being "popped at") on a rival gang member. Then, once defendant Camarena noticed Salvidres, who defendant Camarena concedes appeared to be a gang member, defendant Camarena confronted Salvidres and continued that confrontation while walking back to his vehicle—where he knew (or so the jury could infer given gang expert Saavedra's testimony) that defendant Coronado was armed and waiting. When Salvidres followed, defendant Camarena opened the door to the vehicle and appeared to gesture and speak to defendant Coronado, at which point defendant Coronado got out of the vehicle and very quickly (within roughly five seconds) began firing multiple gunshots at Salvidres—while defendant Camarena looked on observably nonchalant.[4] Then, once defendant Coronado stopped firing and got back into the vehicle, defendant Camarena drove the car out of the gas station, turned in the direction Salvidres appeared to be running, and at some point, an additional shot was fired. And after all that, defendant Camarena continued to associate with defendant Coronado after the murder: they were apprehended together, with guns, twice more before they were arrested for Salvidres's murder. The totality of the evidence summarized suffices to support the jury's finding that defendant Camarena

---

[4]    The very short period of time that elapsed between defendant Camarena appearing to communicate with the vehicle's occupants and defendant Coronado's discharge of the firearm is particularly probative. If defendant Camarena had not encouraged or even directed defendant Coronado to shoot Salvidres, it is hard to imagine why defendant Coronado would have begun firing multiple gunshots at Salvidres so quickly (having had no interaction with Salvidres before that moment).

"aid[ed], facilitate[d], promote[d], encourage[d], or instigate[d]" (CALCRIM No. 401) the murder and shared defendant Coronado's intent to kill. (See generally *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 ["'[a]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense'"].)

To argue the contrary, defendant Camarena likens this case to *People v. Reyes* (2023) 14 Cal.5th 981 and *People v. Ware* (2022) 14 Cal.5th 151—but both are inapposite. In *Reyes*, our high court concluded the evidence did not establish the defendant's conduct was a substantial factor that contributed to a murder where there was no evidence the defendant's acts "precipitated or provoked the shooting," and "no reason to believe that the killing of [the victim] would not have occurred if [the defendant] had not accompanied his fellow gang members . . . or participated in the chase." (*Reyes*, *supra*, at 989.) Here, by contrast, defendant Camarena initiated the incident by confronting Salvidres, appeared to provoke its continuation by continuing to speak and/or gesture toward Salvidres, and called upon defendant Coronado to join the confrontation by opening the vehicle's door and communicating with him (or so the jury could reasonably infer given the video evidence and gang expert testimony) as Salvidres approached. This was sufficient to establish his actions were a substantial factor in the murder. In *Ware*, our Supreme Court concluded there was insufficient evidence for a reasonable jury to conclude the defendant had the requisite intent to participate in a conspiracy to commit murder where the defendant never participated in any act of violence and the evidence proved only that the defendant was an active

16

member of the same gang as the shooter, the defendant had access to guns during the conspiracy, the defendant tried to help the shooter after his arrest for the shooting, and the defendant voiced support on social media for violence against rival gang members. (*Ware, supra*, at 156-157.) Unlike the defendant in *Ware*, defendant Camarena was an active participant in the sequence of events leading up to the murder here.

## 2. *Premeditation and deliberation*

A murder is of the first degree when it is willful, deliberate and premeditated. (Pen. Code,[5] § 189, subd. (a).) A killing is premeditated and deliberate if it is considered beforehand and occurs as the result of preexisting thought and reflection, rather than as the product of an unconsidered or rash impulse. (*People v. Pearson* (2013) 56 Cal.4th 393, 443.) "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. (*Ibid.*) Premeditation and deliberation do not require any extended period of time because a calculated judgment can be made quickly. (*People v. Salazar* (2016) 63 Cal.4th 214, 245.)

Defendant Camarena argues there was insufficient evidence to support the jury's true finding that the murder was in the first degree, relying primarily on the factors articulated by the California Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15. In *Anderson*, our high court identified three categories of evidence as pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner

---

[5] Undesignated statutory references that follow are to the Penal Code.

of killing. (*Id.* at 26-27.) However, the *Anderson* factors are not exclusive and are more of an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125; see also *People v. Rivera* (2019) 7 Cal.5th 306, 324.)

The same evidence summarized earlier in discussing the sufficiency of the evidence to prove aiding and abetting is likewise sufficient to prove premeditation and deliberation. There was strong motive evidence: a gang-related confrontation in rival gang territory, apparently to seek revenge for being shot at earlier. There was strong evidence of a manner of killing suggesting a preconceived design to kill: multiple gunshots, at least one of which was fired at very close range and several of which were thereafter fired at the fleeing Salvidres after twice pausing to fix the firearm that jammed. (See, e.g., *Salazar, supra* 63 Cal.4th at 245; *People v. Thompson* (2010) 49 Cal.4th 79, 114-115 ["manner of killing, a close-range shooting without any provocation or evidence of a struggle, reasonably supports an inference of premeditation and deliberation"]; *People v. Francisco* (1994) 22 Cal.App.4th 1180, 1192 [five or six shots fired from about five feet away supported a finding of premeditation and deliberation].) There was also evidence of planning: the trip into rival gang territory while at least one occupant of the vehicle (on the passenger side) was armed and the extended confrontation with Salvidres while drawing him back in the direction of the armed occupant. (See, e.g., *People v. Shamblin* (2015) 236 Cal.App.4th 1, 13 ["planning activity can happen during an altercation itself and 'over a short period of time'"]; see also

18

*People v. Brady* (2010) 50 Cal.4th 547, 563 ["The lack of evidence of extensive planning does not negate a finding of premeditation"].)

### C. *There Was No Instructional Error*

Defendant Camarena contends the jury instructions did not sufficiently reflect prevailing murder law, including the amendments to sections 188 and 189 that took effect in 2019 (two-plus years before defendants' 2023 trial). He also argues the first degree murder instruction was defective because it did not inform the jury it must find that he *personally* acted willfully, deliberately, and with premeditation and that he was a proximate cause of Salvidres's death. We review defendant Camarena's claim that the instructions incorrectly stated the law de novo.[6] (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

"'[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea'—which here includes knowledge that the direct perpetrator intends to commit the crime . . . , 'and (c) the aider

---

[6] The Attorney General contends defendant Camarena forfeited the point by failing to object to the jury instruction at trial. But, as defendant Camarena argues, we can review any claim of instructional error that affects a defendant's substantial rights whether or not trial counsel objected. (§ 1259 ["The appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Burton* (2018) 29 Cal.App.5th 917, 923.) As we go on to explain, there was no such effect here because the challenged instructions correctly informed the jury of the relevant law.

19

and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime.'" (*People v. Curiel* (2023) 15 Cal.5th 433, 467.) While defendant Camarena is correct that a direct aider and abettor to a murder must have the intent to kill, his contention that the instructions given at his trial were deficient on that score lacks merit.

Insofar as defendant Camarena generally argues the relevant law at the time of his trial was new or had recently changed, he is wrong. The law on aiding and abetting an express malice murder was unaffected by the 2019 changes to sections 188 and 189. (*People v. Gentile* (2020) 10 Cal.5th 830, 848 ["Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought"].)

The aiding and abetting instruction given at defendant's trial was consistent with longstanding law. On the issue of personal intent to kill, the CALCRIM No. 401 given instructed the jury that someone "aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime." By informing the jury that it must find defendant Camarena specifically intended to aid defendant Coronado in his "unlawful purpose" of killing Salvidres, the instruction adequately conveyed prevailing law and was not incorrect for not further highlighting the necessity of a finding of a shared intent to kill. (*People v. Jasso* (2025) 17 Cal.5th 646, 692 ["the jury was also instructed with CALCRIM No. 401, which informed the jury that it could only find Jasso liable as an aider and abettor to murder if it found that he knew the actual perpetrator intended to murder, that Jasso shared the

murderous intent, and that Jasso had in fact aided the perpetrator in the murder"]; *People v. Beeman* (1984) 35 Cal.3d 547, 560; see also *People v. Whalen* (2013) 56 Cal.4th 1, 82, disapproved on another ground in *People v. Romero and Self* (2015) 62 Cal.4th 1 ["[T]he instruction accurately stated the law. If defendant believed the instruction required elaboration or clarification, he was obliged to request such elaboration or clarification in the trial court"].) On the issue of proximate cause, the aiding and abetting instructions informed the jury defendant Camarena must have "in fact" aided defendant Coronado's commission of the murder. This too was a correct statement of law, and the crux of defendant Camarena's complaint seems to be that the trial court did not use the exact language defendant Camarena believes should have been used for maximum specificity and clarity. That, as we have already seen, was not required.[7] (*Whalen*, *supra*, at 82.)

Defendant Camarena also argues the first degree murder instructions given to the jury did not require it to find he personally acted with malice, premeditation, and deliberation. (§ 189, subd. (a) [murder is of the first degree when it is willful, deliberate and premeditated].) But the CALCRIM No. 521 first

---

[7] Defendant Camarena cites *People v. Langi* (2022) 73 Cal.App.5th 972, in connection with his argument that the jury instructions on aiding and abetting were infirm. *Langi*, however, addressed the sufficiency of jury instructions where the defendant was convicted of aiding and abetting an implied malice murder. (*Id.* at 981-984.) Here, the prosecution expressly proceeded only on a theory of express malice, and the jury found the murder was premeditated, not that it was committed with implied malice. *Langi* is thus inapposite.

degree murder instruction informed the jury that "[a] defendant" is guilty of first degree murder if the prosecution proves "he acted willfully, deliberately, and with premeditation."  (Compare *People v. Concha* (2009) 47 Cal.4th 653, 666 [willful, deliberate, and premeditated attempted murder instruction, which referred to "[t]he defendant and/or a principal," was deficient because it did not require a finding that the defendant personally premeditated].)  By using the general article "a" rather than the definite article "the" (or just "defendant" with no preceding article), the instruction here was adequate to convey the jury must make the premeditation determination as to each defendant.

Defendant Camarena counters that because the instruction also states "[t]he defendant acted with *premeditation* if he decided to kill before completing the act that caused death," it only applied to defendant Coronado because he was the one who "completed" the act by shooting Salvidres.  But the instruction did not refer to defendant Coronado, it referred to "[t]he defendant" whose guilt the jury was evaluating.  And as already discussed, the instruction on aiding and abetting required the jury to find defendant Camarena's actions "in fact" aided the commission of the murder.  Read together, the instructions sufficiently conveyed the jury must determine defendant Camarena decided to kill before completing the act that aided and abetted the murder and was a proximate cause of death.

> D.  *Defendants' Challenge to the Determinate Component of Their Sentences is Forfeited*

Defendants contend for the first time on appeal that the trial court erred by not applying section 1170, subdivision (b)'s

22

presumption in favor of a low term sentence where the defendant was a youth at the time of the commission of the offense.

Section 1170, subdivision (b)(1) provides that where "a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term" except under specified circumstances. (See also Cal. Rules of Court, rule 4.420(a) [same].) Section 1170, subdivision (b)(6) provides an exception to the middle term presumption in certain situations. It states a court is to impose the lower term when an enumerated circumstance, including that "[t]he person is . . . or was a youth . . . at the time of the commission of the offense," "was a contributing factor in the commission of the offense[,]" "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice." Thus even when the lower term presumption is triggered by an initial showing that a defendant's youth was a contributing factor in the commission of the crime (*People v. Fredrickson* (2023) 90 Cal.App.5th 984, 991-992), the presumption that the court should impose the low term is rebuttable (*People v. Knowles* (2024) 105 Cal.App.5th 757, 766-767).

"Generally, if a party does not object to [a] sentence in the trial court, they may not claim on appeal the trial court failed to properly make or articulate its discretionary sentencing choices." (*People v. Tilley* (2023) 92 Cal.App.5th 772, 778; see also *People v. Scott* (1994) 9 Cal.4th 331, 351-356 [a defendant forfeits "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" in the absence of objection

23

below].)  Neither defendant argued below that their youth was a contributing factor within the meaning of section 1170, nor did they object when the trial court discussed its view of the operation of the statute and its presumptions.  The issue on appeal is accordingly forfeited.

## DISPOSITION

The judgments are affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


HOFFSTADT, P. J.


MOOR, J.